## Commonwealth v Joseph Boschino, Appellant.

*Criminal law—Murder—Evidence.*

On an indictment for murder the evidence showed that the deceased was shot through the heart by a bullet. Three witnesses for the commonwealth testified that they were at or very near the scene of the alleged murder at the time it was committed, and that they saw and recognized the prisoner as the person who fired the fatal shot. One of the witnesses testified that immediately after the shooting he saw the prisoner running away. There was also testimony that shortly before the deceased was shot an altercation occurred between the prisoner and the deceased, that after the altercation the parties separated, and that the prisoner preceded the deceased on his way home and laid in wait for him. The evidence on

behalf of the prisoner tended to show that at the time the fatal shot was fired he was not at the place where the shooting was done, but was then at his own house some distance away. *Held,* that a verdict of murder in the first degree should be sustained.

*Criminal law—Practice, O. & T.*

The court cannot be convicted of error in not giving instructions that were not requested by the party.

*Criminal law—Flight or concealment.*

On the trial of an indictment for murder, where it appeared that when defendant saw he was accused of having committed the crime he fled and concealed himself, which he explained at the trial was done to escape personal injury at the hands of the accusers, and at the urgent request of his wife and friends, it is not error to charge that, "When a crime has been committed, and the person accused thereof knows he is accused, and then flees or conceals himself, such conduct is evidence of consciousness of guilt, and in connection with other proof may be the basis from which guilt may be inferred."

Argued Feb. 25, 1896. Appeal, No. 60, Jan. T., 1896, by defendant, from judgment of O. & T. Lackawanna Co., Feb. T., 1895, No. 4, on verdict of guilty of murder of the first degree. Before STERRETT, C. J., GREEN, WILLIAMS, McCOLLUM and MITCHELL, JJ. Affirmed.

Indictment for murder. Before GUNSTER, P. J.

The facts and a statement of the testimony for commonwealth appear by the opinion of the Supreme Court, and by the charge of the court below which was in part as follows :

It is sometimes stated, as a general proposition, that flight is evidence of guilt. This must be taken with some qualification. It is necessary that a crime should have been committed, and it is also necessary that there should be something connecting the accused therewith. The mere fact that a man leaves his usual place of residence, and stays away, and conceals himself, is no evidence that a crime has been committed. There must be proof or evidence that a crime has been committed, and then there must be evidence tending to show that the defendant had something to do with it, and under such circumstances flight and concealment by the accused is evidence tending to show guilt. [When a crime has been committed and the person accused thereof knows he is accused, and then flees or conceals

himself, such conduct is evidence of consciousness of guilt, and in connection with other proof may be the basis from which the guilt may be inferred.] [1]   But it must also be borne in mind that flight or concealment may spring from other motives than that of conscious guilt.   A person conscious of innocence may not have the courage to stand trial; he may be frightened and consider himself in danger, and consider it necessary to seek safety in flight, or he may yield to the persuasion of relatives and friends for the purpose of avoiding trial.

Now, these matters are entirely for the consideration of the jury.   They must consider all the evidence bearing upon the question.   I shall refer later on to the evidence by which the defendant seeks to explain his flight.   I do not understand that he denies that he went; on the contrary, he testifies that he did leave.   Now, this, briefly, is the testimony upon the part of the commonwealth.

Upon the part of the defense, you have the testimony of the defendant, Boschino, himself.   He admits that he was at Lally's house when Comforti and the others came there.   He says that he left about three quarters of an hour after Comforti and Umbrianno; that he met them at the Pennsylvania Coal Company's office; that they were standing there or waiting; that he asked them what they were waiting for, and requested them to go home; he said, " Let's go home; " that when they got on the bridge Comforti took hold of him, and that they both went down; that Rocco Salvatori came, and had a revolver; that he asked him what he wanted; that he hadn't done anything; that then he went on and took the wagon road.   He denies that he had a razor; denies that he cut Salvatori.   He alleges that Umbrianno, after he had got up, got a hold of him and asked him to wait, but he said that he went on the wagon road towards his home.   He says that he had no revolver, and fired no shots at anybody; that he left Comforti, Umbrianno and Salvatori down near the bridge; that when he got home, his wife, his mother-in-law, a brother-in-law, the children, Pimpenello and Mingatta were there.   He testifies that his knee had been hurt; he thinks it was hurt while they were down on the bridge, while he and Comforti were down; that his wife had got him a handkerchief for the purpose of dressing his wound or injury; that he heard two shots; that Pimpenello and Mingatta went

out the front door; that some eight or ten minutes afterwards he heard three shots more; that the men then came in, that is, Mingatta and Pimpenello, and told him that there was a crowd outside, and that they charged him and Umbrianno with having killed Comforti, and that they advised him to go away, that the crowd might kill him. He testifies that he stated there and then, when he was charged with this offense, that it was not true, that he had not done it; that his wife urged him to go, that he said he did not know where to go, and that she urged him to go to Forest City, and that she would find out and let him know subsequently what to do, and that thereupon he went to Scranton, to Carbondale, and the next day to Forest City.

Vinzenzo Mingatta is called for the defense, and testifies, if I remember correctly, that he lived over in Hyde Park at that time; that he went up to Boschino's house between 4 and 5 o'clock on the Sunday afternoon in question; that Boschino was not at home, and that he and Pimpenello waited at the house until he came, and that when he did come, at 6 o'clock, Boschino's knee was injured; that while Boschino's wife was handing him a handkerchief, or rag, whatever it was, he heard two shots; that he and Pimpenello went out; they were out sometime when they heard three shots more; that after a while they saw the crowd, and that the crowd said that Umbrianno and Boschino had killed Comforti, and threatened to kill Boschino, and to fire the house; that he went in and locked the door and told Boschino and his wife what they said outside; that his wife advised him to go to Forest City, and that both he and Pimpenello advised him to go. Mrs. Boschino tells substantially the same story. It is not necessary for me to repeat the testimony in detail. Your recollection, probably, is just as fresh on it as mine is.

Alexander Pimpenello testifies that he was with Mingatta, and as to what took place in the house, and about going out doors with Mingatta after the first two shots were fired; hearing the three shots fired subsequently, and as to what the crowd said.

Now, this testimony, in connection with the testimony of the defendant, tends to prove what is usually called an alibi; that is, it tends to prove that at the time when the fatal shot was

fired, the defendant was not at the place where the killing was done, but at another place, to wit, at his own house. Of course, it is impossible for a man to be in two places at the same time. If he was at his own house, he could not have done the shooting ; that is, if he was at the house at the time the fatal shot was fired. Of course, he may have been at his house subsequent to the firing of the fatal shot. The question is, Was he at his house at the time the fatal shot was fired? If he was at his house at the time the fatal shot was fired, of course he could not have fired it himself.

Now, evidence of an alibi, as was stated by counsel for the defendant in the argument of the case before you, is as much a traverse of the matter charged as any other defense, and proof tending to establish it, though not clear, may, with other facts in the case, raise a reasonable doubt of the guilt of the accused. [When the evidence is so imperfect as not to satisfy the jury, they will not find the fact; that is, unless you are satisfied from the evidence of the truth of the alibi, then you ought not to find the fact. And where the commonwealth rests upon positive and undoubted proof of the prisoner's guilt, it should not be overcome by less than full, clear and satisfactory evidence of the alleged alibi.] [3] But the evidence tending to establish an alibi, though not of itself sufficient to work an acquittal, cannot be excluded from the case, for the burden of proof never shifts, but rests with the commonwealth throughout upon all the evidence given in the case, taken together, to convince the jury, beyond a reasonable doubt, of the prisoner's guilt.

This evidence of these witnesses is also evidence tending to show that the defendant fled, not through a consciousness of guilt, but that he fled for the purpose of avoiding trouble, and in pursuance of the request and pleadings of his wife and his friends. All this evidence is for your consideration ; you must consider and see what construction it is to receive if you believe it, if it be true.

[As I said before, it may be that the defendant was down at the shooting, that is not for me to say ; was down where the shooting took place, and was at his house subsequently ; after that was at his house, as other witnesses testify. The question is, at the time the fatal shot was fired, was he at his house, or was he down where the shooting took place? That is where

the evidence bears upon the question of the alibi. And, as I
said before, it also tends to explain why he left, although it does
not, as I understand it, tend to explain why he kept his absence
unknown. Ordinarily, when a man leaves because he thinks
he is threatened by danger, when he is not guilty, if he is threat-
ened by danger, ordinarily men will go to some officer of the
law, or to some law abiding citizen, either in the same or in
some adjoining community, and make known their trouble. In
the present case the evidence tends to show that the defendant
went not only to Scranton, but to Carbondale and Forest City,
and remained there from the 11th to the 24th without making
known to anybody up there why he had left home, until he was
asked about it.] [2, 5]

The defendant has also offered in evidence testimony tend-
ing to contradict some of the witnesses for the commonwealth.
You will remember that Umbrianno was asked as to what he had
told the officers and what he had told a newspaper man, and
what he had said at the lockup, and whether or not Salvatori
had not accused him; evidence tending to contradict him; that
he at different times made different statements; made state-
ments different from those which he made upon the stand
before you. For instance, the statement he made to Mr. Dan-
iels and to Mr. Moriarity. Rocco Salvatori is also contradicted.
He explains it that at the time when this difficulty occurred, or
immediately, or a short time after, he admits that he made state-
ments to different parties that Boschino and Umbrianno—that
is, implicating Umbrianno in the affair—that he had made those
statements, but he denied having made statements of that kind
to some others, and a number of witnesses were called to con-
tradict him, but he says that he was so excited at the time that
he did not know what he was saying, and that when he was at
the lockup he could not understand well; that they were mo-
tioning with their hands, trying to make him understand to
explain who had fired the shots. You have also evidence tend-
ing to contradict John Myran. He was asked whether or not
he had not stated to a number of different parties that he did
not know who had done the shooting, and that he could not
tell who had done it. John Myran testifies that he was sworn
before the coroner's inquest. He testifies on the stand, during
the trial of this case, that at that time, when he was sworn

before the coroner, he did not know who it was who had done this shooting. When asked to explain why he had testified differently now, he testifies that at that time he was afraid; he was afraid to tell the truth about it. As I said before, several witnesses were called who testify that he had told them that he did not know who had done this. There is also evidence tending to show that when Myran was questioned about this matter that he declined, or hesitated, or was reluctant to give any information, and that when he was pressed to give an answer, he stated that when he came to court he would tell the truth about it.

Now, as I said before, there is much contradictory and conflicting testimony, especially among these three witnesses. You have heard what explanation they made for it. These witnesses testify, through the medium of an interpreter; that is, we receive their testimony through the medium of an interpreter; it appears that they do not understand our language. It is important to inquire whether or not, when these parties were questioned in regard to this affair, they knew what they were being questioned about; whether they were cool and collected, and whether they told the truth at that time, or whether, when they come here upon the stand and are sworn, they tell the truth now; I do not know that Umbrianno and Salvatori were sworn at any other time. Yes, I will recall that statement. I think they were sworn before the coroner at the inquest in the case. But Myran testifies that he was sworn at the coroner's inquest, and that at that time he said that he did not know, and he also tells you why he so testified.

Contrary statements made by these witnesses I have admitted, because it affects their credibility. One of them, Salvatori, explains his contradictions by his fright, by his frightened condition. Myran explains his contradictions by fear, and he denies that he made known to anybody, prior to having made known here, who had done the shooting. There are in the case hardly two witnesses, taking the case all through, who narrate the same event or the same transaction in the same way. For instance, take Mr. Klein's testimony, when he testifies that he heard no groans until after the three shots; he is the only witness in the case who testifies to that. No two men ever see the same thing from the same standpoint, and due allowance must be made for

discrepancies in the testimony of men who endeavor to tell the truth. The question is, Do these men tell the truth? Who tells the truth? The truth must be somewhere; no matter how much conflict there may be in the testimony, the truth must be somewhere, and it is for you to ascertain whether or not the allegation made by the commonwealth, that the defendant did this killing, is·true. If the defendant did not do it, he·ought to be acquitted; on the other hand, if he did do it, he ought to be convicted.

You have also further testimony for the defense, as explanatory of his being up there in Carbondale. Raphael Tradascall says that he went for him, took him up to Bevossa's in a buggy.

A number of witnesses have been called also, gentlemen of the jury, who testify as to the character of the defendant. Evidence of good character, or evidence of a good reputation, is always admissible in criminal cases. Its value sometimes depends upon the character of the witnesses themselves who testify to it, as to how long they have known the person in regard to whom they testify, what acquaintance they have with him, and with the men in the community in which they live. [While evidence has been admitted upon the part of the defense, it also appears in part of the testimony that the defendant, some seven or eight months ago, was implicated in some assault upon a man in Dunmore.] [6]

Now, as to the rule relating to evidence of good character, as I understand it, the rule deducible from the authorities may be stated as follows : That evidence of good character is always admissible for the defendant in criminal cases. It is to be weighed and considered in connection with all the other evidence in the case. It may of itself, in some instances, create the reasonable doubt which would entitle the accused to an acquittal. The rule itself is not merely merciful—it is both reasonable and just. There may be cases in which, owing to the peculiar circumstances in which a man is placed, evidence of good character may be all that he can offer in answer to a charge of crime. It is, therefore, necessary for you, gentlemen of the jury, if a good character has been established by the evidence, to consider that fact, the same as you consider any other material fact in the case, in disposing of the case.

Upon the part of the commonwealth there was evidence tend-

ing to show in chief, while the corpus delicti was being proved, while the evidence tending to show that the defendant had committed the crime, that the defendant committed the offense with a revolver. The defendant denied, under oath, that he had a revolver, and to contradict him at that point a number of witnesses were called, some six or eight, who testify that at different times they had seen the defendant having a revolver. If that be true, then that testimony would tend to affect the credibility of the defendant.

As I said before, there is much conflict in the testimony in the case; a conflict between the witnesses upon the part of the commonwealth and the witnesses of the defendant, who are directly opposed. It is for you to say who tells the truth. The credibility of the witnesses is for you; you saw them upon the stand; you heard what they testified to; you saw the manner in which they testified; you heard what interest, if any interest, they had in this issue, and it is for you to determine whether or not they told the truth, and which of the witnesses told the truth.

Verdict of guilty of murder in the first degree.

*Errors assigned* were (1–3, 5, 6,) above instructions, quoting them; (4) that the court erred in not charging that if the jury believed the testimony of Joseph Boschino, of Mrs. Boschino, Alexander Pimpenello and Venzenzo Mingatta, relative to the alleged alibi, it was clearly and positively established by the weight of the evidence.

*George S. Horn, W. G. Ward* and *L. P. Wedeman* with him, for appellant.—Flight or escape, on trial for homicide, it is always proper to show, but the defendant has the right to explain his flight or prove that it was caused by some other occurrence or some other matter: Best on Presumptive Evidence, sec. 248; Kerr on Homicide, sec. 428.

The weight of the evidence is all that is required to fully establish an alibi: Rudy v. Com., 128 Pa. 508; Hiester v. Laird, 1 W. & S. 250.

We contend that the charge was inadequate to the grave requirements of the case, for which reason we claim that the defendant should have another chance for life: Meyers v. Com., 83 Pa. 143.

*John R. Jones*, for appellee.—A trial judge, in his charge to the jury, may express his opinion upon the facts, if done fairly: Com. v. Orr, 138 Pa. 276.

The trial judge instructed the jury correctly as to the law pertaining to the defendant's flight: Com. v. Bezek, 168 Pa. 603 ; Com. v. McMahon, 145 Pa. 413; Com. v. Roland, 8 Phila. 606 ; Com. v. Lundberg, 18 Phila. 482; Com. v. Mudgett, 4 Dist. Rep. 750 ; Fanning v. State, 14 Mo. 386 ; 2 Roscoe's Ev., 751; 9 Am. & Eng. Ency. of Law, 692; Batten v. State, 80 Ind. 394 ; People v. Ogle, 104 N. Y. 511; People v. Giancoli, 74 Cal. 642; United States v. Jackson, 9 Crim. Law. Mag. 325 ; Clark v. State, 8 Crim. Law Mag. 19 ; Peacock v. State, 14 Atl. Rep. 893; State v. Moore, 14 S. W. Rep. 182; State v. Palmer, 20 Atl. Rep. 6 ; People v. Clark, 24 Pac. Rep. 313 ; Carden v. State, (Ala.) 4 So. Rep. 823 ; Sylvester v. State, 1 Ala. L. J. 134; People v. Wong Ah Ngow, 54 Cal. 151; Gose v. State, 9 Tex. App. 437 ; Smith v. State, 58 Miss. 867 ; Aiken v. State, 10 Tex. App. 610 ; People v. Fine, 19 Pac. Rep. 269.

The instruction of the learned court as to the degrees of proof of alibi, under the circumstances of the case at bar, is strictly in accordance with the expressions of this court: Briceland v. Com., 74 Pa 463; Turner v. Com., 86 Pa. 54; Watson v. Com., 95 Pa. 418; Rudy v. Com., 128 Pa. 508.

OPINION BY MR. CHIEF JUSTICE STERRETT, June 3, 1896 :

This appeal is from the judgment of the court below imposing the penalty affixed by law to the crime of murder of the first degree.

The defendant was indicted in due form, tried and convicted of that felony on testimony amply sufficient to dispel every doubt as to the corpus delicti and the existence of all the "ingredients necessary to constitute" the highest grade of felonious homicide. The evidence tended strongly to prove that the deceased, Frank Comforti, was the victim of a willful, deliberate and premeditated murder ; and the only serious question of fact for the jury was whether the defendant was the guilty agent. The testimony adduced and relied on by the commonwealth to establish that fact was not merely circumstantial, but also direct and positive. Three of the commonwealth's witnesses testified, in substance, that they were at or

very near the scene of the alleged murder at the time it was committed, and that they saw and recognized the defendant as the person who fired the fatal shot. If their testimony was believed by the jury, they could have little if any difficulty in reaching the conclusions of fact on which their verdict must necessarily have been based.

After testifying fully and circumstantially as to what occurred on the Sunday afternoon of November 11, when the deceased, the defendant and other companions were together, including the altercation that then occurred, etc., the separation of the company shortly before the deceased was shot, and the direction in which some of them went, Antonio Umbrianno, one of the witnesses referred to, proceeded to say in substance that he went up the hill towards his home, and when he was near the middle of the railroad he heard two shots and saw the deceased, Comforti, fall near the stump; that these shots were fired by Boschino, and two or three minutes afterwards he saw him fire three shots more; that at the time the shots were fired Boschino was in the bushes, on the right side, and Comforti was on the path, walking towards the railroad, in the direction of his home, etc.

Rocco Salvatori, another of said witnesses, testified substantially that he saw somebody—Boschino, as he believed,—shoot from the bushes, and Comforti dropped, and, as he fell, he uttered an exclamation indicating that he was at least seriously wounded; that, as it appeared to him, (the witness,) Comforti heard a noise in the bushes, immediately before the shots, and turned, and, as he turned around, he was shot; that at first he heard two shots, and then Boschino advanced a few steps and fired three more shots.

John Myran, the third witness, testified to having heard two shots, and he then turned back a few steps and faced somebody, in front of him, who fired three shots; that Boschino, the man who fired the three shots, ran towards the Lackawanna railroad; that he (witness) was scared, ran in the bushes and came to where Comforti was lying, looked at the body and saw blood coming out of the mouth, then went home and told those who were there. He also testified that when the first two shots were fired Comforti, who was standing in the path, fell, etc.

According to the testimony of Doctor Kelly, the coroner, he

made a post mortem examination on Monday, November 12, and found a small circular wound, between the second and third ribs at the right edge of the breast bone, which passed through both cells of the heart, the left ventricle of the heart, and through the root of the left lung; and the bullet was found in the cavity of the left lung, with considerable blood, etc. He also testified that this bullet wound was the cause of Comforti's death.

It is not our purpose, nor is it necessary, to further summarize or refer specially to the evidence. It is sufficient to say that the testimony above referred to and a great deal of other evidence, much of which is purely circumstantial, tended to prove not only the commission of a willful, deliberate and premeditated murder on the person of the deceased, but also the defendant's participation therein, as claimed by the commonwealth. On the other hand, the testimony of the defendant himself, and other evidence introduced, in his behalf, tended to show that he was not a party thereto; that at the time the fatal shot was fired he was not at the place where the shooting was done, but was then at his own house some distance away from the scene of the alleged murder. As the learned trial judge— referring to this branch of the defense—very properly said: "If he (defendant) was at his own home when the fatal shot was fired, of course he could not have fired it himself."

No question is raised as to the admission or rejection of testimony. We are satisfied from an examination of the record before us that all the evidence introduced by both parties was properly before the jury, and was clearly for their exclusive consideration. It appears to have been fairly and impartially submitted to them with clear, concise and fully adequate instructions as to the law applicable to every phase of the case. Sixteen requests for instructions were presented by defendant's counsel, in which the law,—relating to the burden of proof, the nature and effect of a reasonable doubt, and other matters pertaining to the defense,—was stated in terms most favorable to the defendant. These requests were all affirmed without any qualification, and the jury were thus provided with a safe and reliable guide in considering the evidence and in endeavoring to arrive at a correct conclusion as to the guilt or innocence of the defendant. In addition to that, the instructions contained in the general charge were, as already intimated, fully adequate

and substantially correct. In connection with these instructions the testimony was impartially reviewed by the learned trial judge, and the rights of the defendant were carefully guarded.

An examination of the record with special reference to the nine specifications of error,—all of which are to the charge,— has failed to convince us that any of them should be sustained. The subjects of complaint in the first three, together with the fifth and sixth, are respectively excerpts from the charge. In neither of these, severed as they are from the context, does there appear to be any substantial error. When read in connection with their respective contexts, every doubt as to their correctness vanishes. In other words, the charge as a whole, including the portions complained of, is clearly correct. The excerpt, relating to the flight of the defendant, recited in the first specification, was immediately followed by statements which brought into view the defendant's theory of the case. The same may be said as to the third specification in which reference is made to the alleged alibi. Indeed, the entire paragraph from which that excerpt is taken is substantially the language of this court in Watson v. Commonwealth, 95 Pa. 418.

It is the special duty of the court to call attention to discrepancies in the testimony, and we are satisfied that, in the discharge of that duty, there was no error in charging as complained of in the second specification. Nor can the court be convicted of error in not giving instructions that were not requested by the defendant, and hence the fourth specification should be dismissed. As we have seen, the defendant's counsel presented sixteen requests for instruction. If other instructions were deemed necessary they should have been requested.

We find nothing in either of the specifications that requires further notice. The case was fairly and correctly tried, and there appears to be nothing in the record of which the defendant has any just reason to complain.

The judgment of the court below is affirmed, and it is ordered that the record be remitted for the purpose of execution.