## Commonwealth v. Newman, Appellant.

*Criminal law—Murder—Robbery — Evidence — Presumption of law—Reasonable doubt—Question of fact—Charge—General exception—Appeal.*

1. Where property stolen at the time of a murder is subsequently found in the possession of the defendant, and his explanation of his

possession of the property is not only entirely unconvincing, but bears on its face evidence of bad faith, the jury have a right to weigh his statements against him, in deciding the question of his guilt.

2. The possession by a person of recently stolen property is evidence from which it can be found he is the thief, but the presumption is one of fact, not of law, and the jurors must pass on it as a part of the evidence against the accused.

3. The jury must also judge of the explanation of the accused, which, even though not entirely believed, may raise a reasonable doubt of defendant's guilt, or, if accepted as true, may overcome the presumption or inference against him, and require further proof from the prosecutor.

4. If the explanation is rejected in whole or in part because unworthy of belief, this may serve to strengthen the case of the Commonwealth.

5. An instruction that possession of the property by the defendant raises a presumption of law that the defendant stole it is not ground for reversal, where the jury is repeatedly informed that the truth and reasonableness of defendant's explanation are matters for them and not for the court to determine.

6. A trial judge need not repeat with each separate instruction the fact that the Commonwealth must prove every essential element of its case beyond a reasonable doubt.

7. The court commits no error in refusing to affirm a point for defendant in a murder case, where no evidence produced by either side warrants the decision of the case on the theory suggested by the point.

8. Where defendant takes only a general exception to the charge, he is not in a position to complain of mere inadequacies, lack of fullness at certain points, or failure to reiterate relevant principles in connection with named instructions when these are stated elsewhere in the charge.

Argued January 29, 1923. Appeal, No. 38, Oct. T., 1923, by defendant, from judgment of O. & T. Allegheny Co., June T., 1922, No. 17, on verdict of guilty of murder of the first degree, in case of Com. v. Marcus W. Newman, alias Samuel Kaufman. Before MOSCHZISKER, C. J., FRAZER, WALLING, SIMPSON, SADLER and SCHAFFER, JJ. Affirmed.

Indictment for murder.   Before Bell, P. J., specially presiding.

The opinion of the Supreme Court states the facts.

Verdict of guilty of murder of the first degree upon which sentence was passed.   Defendant appealed.

*Errors assigned* were various instructions and the sentence, quoting record.

*Morris Feldstein,* for appellant.—The court erred in its instructions as to the effect of proof of possession of recently stolen property, and the burden of proof resulting therefrom: Com. v. Chester, 77 Pa. Superior Ct. 388; Com. v. Berney, 28 Pa. Superior Ct. 61.

The courts erred in qualifying defendant's third point as to an accessory before the fact.

The fact that the court in another part of its charge stated the law correctly, does not cure the error: Com. v. Deitrick, 218 Pa. 36; Com. v. Ross, 266 Pa. 580.

*Harry A. Estep,* Assistant District Attorney, with him *Samuel H. Gardner,* District Attorney, for appellee, cited: Wilson v. U. S., 162 U. S. 613.

Opinion by Mr. Chief Justice Moschzisker, March 12, 1923:

Marcus W. Newman, alias Samuel Kaufman, appeals from a sentence condemning him to be electrocuted for the murder of James L. McCullough.

On February 26, 1921, about 6:30 a. m., McCullough, a United States railway mail clerk, was found unconscious at his desk in the car on which he worked, with his skull so badly crushed that he died within a few hours; beside him lay a large steel pin-bolt, with which the fatal blow evidently had been struck. Shortly after the discovery of the assault, there was found to be missing a jacket of registered mail (No. 273), containing identified bonds to a par value of $28,500, which had been delivered to Mc-

Cullough an hour before. Four days afterward (March 2, 1921), defendant sold one of these securities through a firm of Philadelphia brokers, and between that date and June 3, 1921, he disposed of $25,000 worth of them through various brokerage houses in New York and Philadelphia. In all these transactions, except the first, when accused used his own name, he represented himself as Samuel Kaufman, and it was while masquerading under this alias, in an attempt to sell two other bonds taken from jacket No. 273, that he was apprehended, in March, 1922. A mass of circumstantial evidence was presented at trial, which carries conviction of defendant's guilt beyond a reasonable doubt.

The accused took the stand in his own defense, swore he had no connection with, or knowledge of, either the robbery or the murder, and gave the following explanation of his possession of the stolen bonds: They were given to him, he said, with a number of other securities, on March 1, 1921, by two men named Harry Katz and Moe Sternberg, who claimed to have obtained them in Chicago from a certain Samuel Kaufman (the prisoner's alias); the arrangement with these men, according to Newman's testimony, was that he should sell the bonds and receive in payment one-third of the proceeds plus a bonus of $5,000. Defendant stated he did not know where Katz and Sternberg lived during their course of dealing with him, and that he did not write to them, because, when there was any business to transact, the three always met "by appointment," usually in the lobby of a large hotel in New York City; when he was in New Orleans and desired, on two separate occasions, to pay his confederates $5,000 as their share of certain sales, he put $2,500 cash in each of two envelopes, and mailed them, unregistered, to Katz and Sternberg, "General Delivery, New York City."

The prisoner admitted he had sold only the bonds identified as taken from jacket No. 273 to the various brokers who appeared against him at the trial, and the evi-

dence showed that his bank deposits approximated the value of these sales alone; nevertheless he claimed that Katz and Sternberg turned over to him a large amount of additional securities, which he had disposed of through representatives (whose names he did not know) of three other brokerage firms in New York and Philadelphia, all of whom, it appeared, had failed and suspended business dealings a few months prior to the trial.  The story of these additional sales was evidently interposed by the prisoner to make it appear that he had not dealt exclusively in the stolen bonds.  In this connection, Newman said that, on March 4, 1921, he sold three $1,000 Liberty bonds in jewelry stores in Pittsburgh; but, although he had lived in that city almost nine years and worked five years within a block of the section where he claimed these stores were located, he was unable to identify them by name or tell their situation with any precision.

When first arrested, Newman, who was armed with a loaded pistol, gave an address which turned out, upon investigation, to be an empty lot.  He denied being the man who had opened the bank account with the West End Trust Company, through which some of the money realized from the sale of the stolen bonds passed; but, when taken there and fully identified, he admitted the account was his, though carried in the name of Kaufman.  He refused the offered aid of both the government of the United States and the Pennsylvania Railroad's secret service to corroborate the tale about his mythical confederates, saying "He did not want to do them any harm"; and he declined to give information which would help the police to find either Katz or Sternberg, although he was endeavoring to place responsibility on them for acts charged against himself.  According to defendant's testimony, he was an habitué of a billiard room in Pittsburgh, where he often met Katz and Sternberg, and he admitted knowing "quite a few [other] men," frequenters of this place, who also knew Katz and Stern-

berg well enough "to speak to them," yet he made no mention, by description, names or otherwise, of persons who might be called on to prove the existence of these two men. Moreover, while claiming, for purposes of his defense, to have had financial transactions with the men in question to the extent of many thousands of dollars beyond the value of the stolen bonds identified by the prosecution, he produced no corroborative writings or other evidence to substantiate his very improbable story.

In short, defendant's account of the existence of Katz and Sternberg and of his dealings with them, is uncorroborated both as a whole and in its details; his testimony explanatory of his possession of the stolen securities is not only entirely unconvincing, so far as his alleged innocence is concerned, but bears on its face such evidence of bad faith as tends strongly to support the case of the Commonwealth; and this fact the jurors had a right to weigh against him in deciding the question of his guilt (Com. v. McGorty, 114 Mass. 299, 303; State v. Raymond, 46 Conn. 345, 346), which the verdict indicates they did. When the proofs in the case are taken as a whole, they fully warrant a belief that accused himself stole the bonds subsequently sold by him; that the theft was committed by robbing the mail car, as stated above; and that, in the robbery, deceased was killed. This, whether the fatal blow was struck by defendant or a confederate, would be murder of the first degree under our statute, which the jury very properly found. The only question for us is, Were there trial errors which require a reversal of the judgment entered on the verdict?

In charging the jury as to the legal effect of possession of stolen property, the court said: "Where property has been stolen and is speedily found in the possession of some one, the law puts upon him the burden of its explanation. Otherwise, he is deemed to have been the thief. The law does not fix any specific period of time for which that duty or burden shall rest. Much depends upon the character of what the property is. But when-

ever one is found in the possession of property which has recently been stolen, there rests upon him the burden of explanation. Otherwise, he is presumed by the law to have stolen the property. Whenever a murder is committed so that property can be stolen, the law and common sense concur in demanding an explanation from one who is found in possession of that property which has recently been stolen." Appellant, in his first specification of error, complains that, under these instructions, a presumption of law was applied to make his guilt follow a mere possession of the stolen bonds.

The guiding rule may be stated thus: The possession of recently stolen property by a person is evidence from which it can be found he is the thief, but the presumption is one of fact, not of law, and the jurors must pass on it as part of the evidence against the accused. In doing this, they must also judge of his explanation, which, even though not entirely believed, may raise a reasonable doubt of defendant's guilt, or, if accepted as true, may overcome the presumption, or inference, against him and require further proof from the prosecutor; on the other hand, if the explanation is rejected in whole or in part because unworthy of belief, this may serve to strengthen the case of the Commonwealth accordingly. These principles were recognized by us many years ago, and applied against a possessor of alleged stolen property, who was on trial for murder, in Williams v. Com., 29 Pa. 102, 106, where we said that "possession of the fruits of crime is of great weight in establishing the proof of murder, when that crime has been accompanied with robbery."

In the instructions here complained of, the judge charged that, if the possessor of purloined goods fails to meet the burden of explaining his possession, "he is presumed by the law to have stolen the property." Strictly speaking, the words, "presumed by the law" are not correct in this connection, but, when read in conjunction with the remainder of the instructions on the point

involved, we are not convinced they constitute reversible error. The jury were not told the presumption was conclusive, and they were repeatedly informed that the truth and reasonableness of defendant's explanation were matters for them and not for the court to determine: see Wilson v. United States, 162 U. S. 613; Campbell v. State, 150 Ind. 74, 49 N. E. 905. The jurors were even told, for the benefit of defendant, that "a story may be strange or weird, sometimes unreasonable, and still be true"; that, if they saw fit to accept his explanation of the possession of the bonds, they might do so; and, under the whole charge, this would have led to an acquittal. In other words, while the trial judge used the expression "presumed by law," what he described, taking the charge as a whole, was a presumption of fact, which, if not explained away to the satisfaction of the jury, warranted a finding in accordance therewith; there is no likelihood the instructions were misunderstood in this respect by those to whom they were addressed.

We cannot agree with appellant's assertion that the charge before us is "almost identical" with that in Com. v. Chester, 77 Pa. Superior Ct. 388; and, under the circumstances of the instant case, we see no merit in the first complaint. It may be added that, as appellant took only a general exception to the charge, he is not in a position to complain of mere inadequacies, lack of fulness at certain points, or failure to reiterate relevant principles in connection with named instructions when these were stated elsewhere in the charge; particularly is this true where, as here, in all probability, such omissions did not work defendant material harm.

The second assignment of error relates to the instruction that "It is for you and not for the court to determine whether or not the explanation afforded by the defendant is a rational one; whether, after having heard it, [and] observed him upon the stand, taken in connection with all the other evidence in the case, it is an explanation which you accept. If you do not, then the possession

goes unexplained. If you do, then the explanation is good." The objection is to the use of the word "accept" without stating that, if the explanation raises a reasonable doubt of defendant's guilt, this is sufficient and the jury cannot convict. The trial judge need not repeat with each separate instruction the fact that the Commonwealth must prove every essential element of its case beyond a reasonable doubt; the court so instructed the jury in this case, and referred to the "reasonable doubt" rule twenty-two times in the course of the charge and answers to points; we cannot believe the omission to again mention it in this particular instance harmed defendant. His counsel evidently did not think so at the trial, for, when the judge asked if any additional instructions were desired, he answered, "No, that is all," and took only a general exception to the charge, without attempting to point out or complain of any particulars.

The third alleged error is the answer of the trial judge to one of the prisoner's requests. The point submitted reads as follows: "If you are not satisfied beyond a reasonable doubt that defendant committed the alleged robbery or aided, abetted, counselled or assisted any other person or persons in the commission of it, then your verdict must be not guilty, even though you believe defendant sold the bonds with full knowledge that they had been stolen in the alleged robbery." The request was affirmed with this explanation: "If the defendant had no part in the alleged robbery and did not aid, abet, counsel, assist, advise or conspire with any one else that it should be done, and had no connection with or knowledge of it until after its commission, your verdict must be not guilty, even though at the time he sold the bonds he knew they had been stolen from this mail car at the time of the alleged killing." The objection is that, under this answer, if defendant had knowledge of the intended crime before its commission, and subsequently sold the bonds, knowing where they had been obtained, he could be convicted as a principal. We see no merit in this

complaint, for the request and explanation as a whole do not give the suggested impression; moreover, elsewhere in the charge, the court specifically instructed that mere knowledge of another's intent to commit a crime, and concealment of such knowledge, would not involve the party in any guilt; finally, the point as submitted is erroneous in itself, for, under it, even had accused committed the murder, he could be acquitted, provided the jury doubted his guilt in respect to the robbery.

Next, appellant assigns as error the answer the trial judge made to another of his requests for charge, the request being to the effect that, if the jury found defendant had planned the robbery with others, but, prior to its commission, repented and refused to be a party to it, and so notified the others, then he must be found not guilty. The court approved the point as an abstract legal proposition, but added, "we know of no evidence in the case from which it could be found that defendant, after having planned a robbery, withdrew from it and notified his associates of such withdrawal. Defendant has denied he entered into any plan."

To sustain this last-mentioned assignment, counsel for defendant argues he was entitled to an affirmance of his point, without qualification. His idea is that, albeit, at trial, the testimony which he now relies on for support was specifically denied by defendant, nevertheless it was possible the jury might believe it, and, accepting the Commonwealth's version of various statements alleged by the prosecution to have been made by accused shortly after his arrest, therefrom find that he, with the two alleged "gunmen," did in fact plan the robbery; but even though it be granted that counsel for the prisoner had the right to anticipate by his request the possibility of the jury accepting the evidence of the Commonwealth, yet, as the court below states in its answer, there is nothing in that evidence from which it could be found defendant, after agreeing to go into the robbery, had repented and

withdrawn, as detailed in the request. In other words, the evidence on neither side would warrant the decision of the case on any such theory.

In conclusion, we may add, the trial judge was entirely within his rights when he called the jury's attention to the fact that defendant had denied entering into a plan with Katz and Sternberg for the robbery. The judge might have gone further and said certain witnesses produced by the Commonwealth also testified that the prisoner claimed to have refused to take part in any such affair; the final words of the answer, as to defendant's denial, could have done the prisoner no harm, for they merely again called his side of the case to the jury's attention, so they might not think, from the way the point was drawn, that he was abandoning the position taken in his own testimony. The strong probabilities are, however, that the jury refused to accept the prisoner's story of his dealings with the two "gunmen," and did not believe Katz and Sternberg had any existence, other than in the fictional narrative of defendant; we so conclude, for this is the impression a reading of the testimony has made upon us.

The assignments of error are all overruled, the judgment is affirmed, and the record remitted for purpose of execution.