## Commonwealth v. Patterson

*Burton R. Laub*, district attorney, for Commonwealth.
*Louis R. Benacci* and *Edward Carney*, for defendant.

KITTS, P. J., March 19, 1941.—The defendant in this case, Harold Patterson, was indicted for murder on February 10, 1941. The case was properly certified to the court of oyer and terminer, whereupon the defendant, being arraigned, pleaded guilty. The defendant was without funds to employ counsel, and we appointed Edward

H. Carney and Louis R. Benacci, members of this bar, to defend him. The plea was entered after he had benefit of said counsel.

On February 18, 1941, this court sat in banc and took testimony for the purpose of determining the degree of the defendant's guilt. Learned counsel for the defendant contend that the degree of guilt in this case can rise no higher than manslaughter. The learned district attorney, Burton R. Laub, asks for a verdict of murder in the first degree, does not press for the death penalty, but asks the court to impose a life sentence upon the defendant.

### History of the case

At approximately 11:37, on the evening of November 18, 1940, the city police received a call to come to Twenty-first and Green Garden Road, which is a wild locality on the outskirts of the City of Erie and frequently referred to as "The Jungles". When the police arrived at the scene after one unsuccessful attempt to find the person who had called, they met defendant, Harold Patterson, who directed them to a scene located in the center of a dumping ground and which was the dwelling place of the deceased, Alex Prezinski. When the police arrived at the shack, Prezinski was lying on the floor with his head in a pool of blood. The hospital was notified and an ambulance came to remove Prezinski, who died the following morning as a result of skull fractures.

The police, upon questioning defendant, were told by him that he, defendant, had gone to a grocery store for groceries, had stopped for a few bottles of beer, and upon returning to his own shack, which was situated some distance north of the decedent's shack, he had seen a colored man by the name of Frank Hunt leaving the decedent's shack and carrying a 2½ foot length of heavy iron pipe. He stated that when he first saw Hunt he was some distance from him and that Hunt ran away in the direction of defendant's shack. He said that he then went over to the decedent's shack, looked in the door, and saw

him in a pool of blood, that he went in and blew out the lamp, and then went over on Green Garden Road where he asked Mrs. Kenneth Cook, one of the Commonwealth's witnesses, to call the police. He states that he then went back to his own shack and that Frank Hunt came out of his (Patterson's) shack, carrying the same piece of pipe, and threatened to get even with him (Patterson). Defendant then directed the police to where Hunt might be found, and Hunt was placed in custody. Subsequently at the police station Patterson reiterated his accusations against him.

A few days later, Chief County Detective Leroy Search, after having been told that a pipe had been found near the door of the decedent's shack, went to the county jail with the pipe and talked to defendant. Defendant then made a confession, which is in evidence, and which in substance stated that he went to Prezinski's place for the purpose of asking Prezinski for some money which he allegedly owed defendant. He stated that during the talk Prezinski made a gesture towards a butcher knife which was on the table and that he then struck Prezinski on the jaw with his fist, knocking him to the floor. He stated that he then left the shack and Prezinski got up and came to the door, where he said something of a threatening nature to defendant. At this juncture, defendant said in his confession that he fell to the ground and picked up this pipe. As Prezinski turned to reënter the shack, defendant struck him on the head with the pipe, and after the deceased fell to the floor defendant reëntered the shack, where he searched the prostrate form with the idea in mind of receiving any money which might be found. The evidence disclosed that no money was taken from the decedent. There was a small purse with a number of coins on the person of the deceased which was untouched, and two other coins on the floor of the shack, which the police found. We deem it unnecessary to detail the confession in this opinion, as at the time of the hearing of testimony defendant admitted substantially what he

had stated in his confession but added the fact that the deceased had actually seized the butcher knife when he struck him the first time, and that when the deceased came to the door he saw something shiny in his hand and that he swung the pipe as the deceased turned to reënter the shack, and that before he, defendant, could check his swing the damage to the decedent's head had been done. There was considerable testimony as to defendant and this man, Frank Hunt, having been together during the day and as to the quantity of alcohol they had consumed. It appears that they were at a "speakeasy" which since has been raided and put out of business. Defendant testified that they had been drinking cut alcohol, which they called "Joe Louis", together with beer, and then later in the evening some time prior to the homicide he was at Popp's Inn, and he testified as to the amount of ale or beer he had consumed at this place. Defendant made an attempt to partly excuse his actions from the fact that he had too freely imbibed that day and evening. However, upon being interrogated by the court, he admitted that he knew right from wrong. He steadfastly maintained that he had no thought of committing robbery upon the person of the deceased when he entered the shack, and that robbery was not in any wise a motive for the killing. In addition to this, he set up in his testimony a plea of self-defense, stating that when Prezinski came to the door of the shack he had something shiny in his hand; that defendant was afraid that it was the butcher knife, and that on account of his fear he delivered the blow, admitting, however, that he struck the decedent but once. The testimony of the pathologist, Dr. Zeman, shows that there were two distinct fractures of the skull and that the force of the blows was so great that contrecoup fractures resulted on the opposite side of the skull as a result of bone vibrations which were set up by the original blows.

At the outset we are satisfied that while the amount of alcohol consumed by defendant might have been the motivating cause of the homicide, yet he was not so intoxicated

that he could not contemplate the rashness of his act. We further hold a reasonable doubt from all the evidence that there was any intention of robbery in the mind of the defendant when he first entered the shack or when he struck the blows which caused death.

Let us first dispose of the instrumentality used in perpetrating this homicide. This was a heavy metal pipe, about 1¾ inches in diameter and 18 inches long, weighing 3 pounds and 14½ ounces. It is clear that this pipe can legally be classed as a deadly weapon. Any instrument capable of causing death, however innocent its original purpose, becomes a deadly weapon when used for purposes of violence: Commonwealth v. Kluska, 333 Pa. 65. This, however, like any other question of fact, is one for the court to determine upon a plea of guilty, but it has been decided in a number of cases that instruments not necessarily deadly weapons become deadly weapons when improperly used. Thus, in Commonwealth v. Blakeley, 274 Pa. 100, a club was found to be a deadly weapon. And in Commonwealth v. Newman, 276 Pa. 534, a steel pin-bolt; and in Commonwealth v. Anthony, 259 Pa. 65, a shovel; and in Commonwealth v. Murray, 2 Ash. 41, a wheelbarrow stick with a strap, were all found to be deadly weapons within the meaning of the law. The use of a deadly weapon upon a vital part of the body, in the absence of evidence to the contrary, ordinarily presumes an intention to kill. Such presumption rises no higher than murder in the second degree, but if there are elements of premeditation, or of the perpetration of a robbery, or of the application of extreme force including the infliction of more wounds than the circumstances would justify, then defendant is guilty of first degree murder. We are of the opinion that there was no intent to kill in this case, nor was there any premeditation, and that the robbery, if any, was merely an afterthought entering the mind of defendant in his intoxicated condition after the homicide had been committed. We will have more to say on the question of robbery in this opinion.

Learned counsel for defendant maintain that the verdict or finding of the court in this case cannot rise higher than manslaughter. This is not a trial. See Commonwealth v. Petrillo, 340 Pa. 33. Then, too, we are confronted with the fact that defendant has entered a general plea of guilty. He was indicted for murder. Irrespective of this, it is our opinion that this is not a manslaughter case. Voluntary manslaughter is a homicide intentionally committed under the influence of passion. It has also been defined to be the unlawful killing of another without malice, express or implied. See Commonwealth v. Colandro, 231 Pa. 343, and Commonwealth v. Drum, 58 Pa. 9, 17. In a homicide case, manslaughter so often nearly approaches murder that it is difficult to distinguish between this and murder in the second degree. Manslaughter is never attended by legal malice or depravity of heart or that condition or frame of mind exhibiting wickedness of disposition, recklessness of consequence, or cruelty, whereas second-degree murder is the unlawful killing under circumstances of depravity of heart and a disposition of mind regardless of social duty, where no intention to kill exists or can reasonably be inferred.

In this case we are confronted with Commonwealth v. Stelma, 327 Pa. 317, where the Supreme Court held:

"Moreover, even though such were the case, it is immaterial when the design to rob was conceived, if the homicide occurred while defendant was perpetrating or attempting to perpetrate a robbery".

But that case does not rule the instant case. Reading further into the Stelma case, at the bottom of pages 321 and on page 322, the Supreme Court said:

"Such considerations do not affect the situation here presented, because the circumstances leading up to the attack on Doyle indicate an assault with an intent to rob, and the defendant has twice confessed his crime in writing. The question of defendant's guilt and the degree of the crime are primarily for the jury to determine."

We have no doubt that Justice Barnes, in using this phraseology, had in mind the fact that the issue of robbery had been fairly decided as an issue of fact by the jury. As a fact-finding tribunal we are clearly of the opinion that this homicide was in no wise motivated by robbery, and that the ruling laid down in the Stelma case should not apply indiscriminately to every murder case.

. . . .

The Penal Code of June 24, 1939, P. L. 872, sec. 701, under which the defendant was indicted and the testimony taken, provides as follows: "All murder which shall be perpetrated by means of poison, or by lying in wait, or by any other kind of willful, deliberate and premeditated killing, or which shall be committed in the perpetration of, or attempting to perpetrate any arson, rape, robbery, burglary, or kidnapping, shall be murder in the first degree." This portion of the act is an exact reënactment of the first portion of the Criminal Code of March 31, 1860, P. L. 382, sec. 74, as amended by the Act of May 22, 1923, P. L. 306, sec. 1, with the exception that the earlier acts concluded with "shall be deemed murder in the first degree", whereas the Act of 1939 simply states, "shall be murder in the first degree". We are mindful of the rule laid down in Commonwealth v. Rush, 277 Pa. 419, that the Commonwealth is not bound by the statements in the confession, the rule being that incriminating statements may be accepted and self-serving ones may be rejected.

From all the evidence in this case we cannot find that there was a wilful, deliberate, and premeditated killing constituting murder in the first degree. It is perfectly possible and probable that the weapon used in this case, to wit, the iron pipe, was not obtained or prepared by defendant until the instant at which the decedent came to the door of the shack, and that there was no well-laid plan to perpetrate a murder and a robbery. It is true that the attempt of defendant to escape apprehension and punishment by means of a clever accusation against an

innocent man weighs heavily against him. However, in his inebriated condition this could arise as easily under any other degree of homicide, in this case. The evidence does not satisfy us that there was even a momentary premeditation and that defendant had any intent to kill Prezinski at the time he struck the fatal blow or blows.

Under the common law, murder is defined to be when a person of sound memory and discretion unlawfully kills any reasonable creature in being and under the peace of the Commonwealth with malice aforethought either express or implied. There is always a distinguishing criterion of murder in the question of malice aforethought. While the burden of proving the intention to kill rests upon the Commonwealth, this proof need not be positive; it may be inferred from circumstances and show the existence of the intention to kill, thereby implying malice of the heart with which it was done. Surely, if a defendant uses a deadly weapon upon the body of another, he must, in the absence of qualifying facts, be presumed to know that his blow is likely to kill, and, knowing this, then he must be presumed to intend death, which is the probable and ordinary consequence of such an act, especially where there is not sufficient provocation. No time is too short in the eyes of the law to form a design or deliberation to take human life and fully to form the conscious purpose of killing, to constitute murder in the first degree. Yet under all the evidence we cannot satisfactorily say that this was murder in the first degree. The suddenness in which this homicide was perpetrated is flatly opposed to premeditation, and under all the evidence we find that this was the immediate offspring of rashness and impetuous temper and that the mind of the defendant was not fully conscious of its own design, but that this crime was perpetrated out of depravity of heart and a disposition of mind regardless of social duty, with no intention to kill, and therefore constitutes the crime of murder in the second degree. We further find from the evidence that the defendant had no specific intention of taking the life of

Alex Prezinski, did not intend to kill him at the time, but was rash and reckless in his conduct. There was not sufficient evidence to find that the defendant had procured this pipe and carried the weapon intending to use it when an opportunity arose. There was no deliberation, but in the suddenness of the occasion at the door of Prezinski's shack he picked up the iron pipe and in the suddenness of the affray and with impetuous temper he dealt the blow, not with intention to kill but with a mind utterly devoid of social duties or consequences.

### Verdict

And now, to wit, March 19, 1941, in view of the foregoing, we find the defendant, Harold Patterson, guilty of murder in the second degree.