Commonwealth *v.* Homeyer, Appellant.

Argued January 5, 1953. Before STERN, C. J., STEARNE, JONES, BELL, CHIDSEY, MUSMANNO and AR-NOLD, JJ.

*Davis R. Hobbs* and *Roy A. Gardner,* with them *Hobbs & Gardner,* for appellant.

*Robert W. Trembath,* District Attorney, with him *Robert E. Farr* and *Kenneth Lee,* for appellee.

OPINION BY MR. JUSTICE BELL, February 13, 1953:

Defendant was found guilty of murder in the first degree and the penalty was fixed at death. His counsel cited over 80 reasons for a new trial; 9 of these are pressed on this appeal.

On *March 28th or March 29th, 1950,* Anna Snelleman Homeyer, wife of the defendant, died or was murdered in their residence in Factoryville, Wyoming County, Pennsylvania. On March 7, 1951, a well preserved head, which had been severed from the body at the neck, and a part of the pelvis of a female were found encased in concrete buried in a wash tub in the cellar of the Homeyer home. The head was identified as that of Anna Snelleman Homeyer.

The defendant told so many different and conflicting stories to so many people that it would take a great many pages to recount them, or even to enumerate his fabrications. It will suffice we believe to give the following brief summary.

The defendant told the District Attorney and the police that March 28, 1950, was Anna Homeyer's birthday. Although he alleges she had no friends, she became angry, according to him, because no one called on her to wish her a happy birthday. Consequently defendant went to a store and purchased a cake and whipping cream for the purpose of making her a birthday cake. When he went back to her bedroom he found her dead. She had been sickly for five years and had had high blood pressure. On the floor in her bedroom defendant said he found a sleeping pill and an empty bottle which he had received from Doctor Patrick the day before and which had contained 20 Napentals. He said the bottle was open and only one capsule remained. Eighteen capsules would be a fatal dosage to a person in the physical condition of Anna Homeyer. Upon discovering the body defendant alleged that he was

seized with panic; fearing he would be held responsible for his wife's death, he decided to dispose of her remains. According to his story he carried the body to the bathroom and dismembered it; then he burned certain portions of her body in the furnace of their home on the night of March 29th and the night of March 30th. He said the odor from the burning body was so terrible it made him sick and he had to drive around the country for several hours. Neighbors testified that they smelled the odor and the nearer they got to the Homeyer house the stronger the stench became. Defendant then buried his wife's head and the portion of the pelvis in cement in the cellar of the residence. Defendant put her stomach and some of her intestines in a package and part of the torso, legs and arms in another package and threw one into the Susquehanna River at Owego on March 29th, and the other package into the Delaware River at Delaware Water Gap on the 30th. He then left town on *March 31st* and went to Florida and then to California.

Defendant, like most defendants, proceeds on the assumption that you must believe all of his statements or confessions; of course, that is erroneous; a jury can believe all or a part of or none of a defendant's statements, confessions or testimony. The theory of the defense is that Anna committed suicide, and the dismemberment of her body after she was dead does not constitute a crime. Defendant's principal contention on this appeal is that, apart from his own statements or confessions, there was no proof of the corpus delicti and consequently an acquittal should have been directed, or a new trial must be granted.

Defendant married Anna Snelleman in 1944. At the time of her death he was 52 and she was 64. In 1948 she purchased with her own money premises known as 210 Riverside Drive, Factoryville, Pennsyl-

vania, and took a deed in the name of Charles E. Homeyer and Anna Homeyer, his wife. She opened a savings account at an undisclosed date in her own name in the First National Bank of Factoryville. Between the time of the opening of this account and the date of her death defendant withdrew $4400 from the savings account by forging his wife's name on 12 withdrawal slips. On March 29, 1950, he withdrew an additional $500 by means of a withdrawal slip purporting to have been signed by his wife. The Commonwealth also proved that in June 1950 defendant had in his possession saws, knives and a meat cleaver which are useful tools for beheading and dismembering a body.

In the Fall of 1949 defendant began corresponding with a woman named Nancy Parker through a "Lonely Hearts" magazine. In his letters he told her he was a widower, said he had a house, a diamond ring and an engagement ring which he offered her and suggested marriage. In March, 1950 he wrote her and secured her telephone number at a near-by drug store. On March 29 he telephoned her, arranging to meet her at New Castle, Pa., on March 31. He took her to California under promise of marriage; what happened thereafter is not clear. On the way to California and after he got there he wrote many cards and letters to Anna's friends and neighbors telling them Anna was with him, was happy and never felt better in her life, loved California and planned to sell her Factoryville home and live in California. He told Nancy Parker that his wife had died the year before.

On June 3, 1950, defendant returned to Factoryville and told his neighbors Anna was in California and did not want to make the trip back. He told another neighbor Anna was in Montana with his daughter. Previously he had told some people that Anna

had left him on the morning of *March 29* to go to New York; he told others that she had gone to Rochester, and still others to Milwaukee, stating or implying to these friends that Anna and he were permanently separating.

Defendant on his return to Factoryville did some cementing inside his house, sold the household furniture, burned Anna's clothing; sold meat saws and gave away butcher knives. He likewise sold the house for approximately $5700; forged his wife's name to the deed and had a notary public acknowledge it even though his wife was not present. He again sent letters and cards to Anna's friends saying how much she was enjoying California. He then returned to California with another woman, Maggie Woodal, whom he first contacted in July 1950, and married in September 1950. He told Maggie that his wife had died in bed five years before of kidney trouble. After that, he wrote an acquaintance of Anna's in New York that Mrs. Homeyer had passed away in her sleep the morning of September 3 and there had been no illness

On January 16, 1951, he forged Anna's signature to a letter asking for the cash surrender value of her policy of insurance. On January 24, 1951, he was located in Los Angeles by a deputy sheriff who asked him the present whereabouts of his wife, Anna. He told the sheriff that Anna died March 7, 1950, in Bronx, New York, from high blood pressure and was buried March 11, 1950, in St. John's Cemetery and that she had no life insurance. Defendant left Los Angeles immediately after this statement, but foolishly returned a week later and was arrested, charged with forgery. While being brought back from California by detectives, defendant attempted suicide on the train. It is unnecessary to narrate any more of defendant's many fabrications, lies and conflicting statements.

The most important contention made by defendant is as above mentioned, that there was no proof of corpus delicti, apart from his own statements or confessions. There is no merit in this contention. Proof of a head severed from the body and encased in concrete in the cellar of *defendant's home* followed by proof of the identity of the head as that of Anna Homeyer was sufficient evidence, without anything more, of the corpus delicti. Apart from any confession by the defendant, it is obviously impossible for a woman to dismember her head and bury it in concrete in defendant's cellar.

The Commonwealth has the burden of proving beyond a reasonable doubt a wilful, deliberate and premeditated killing in order to constitute murder in the first degree. The Commonwealth in such a case, in order to establish the corpus delicti, must prove (1) that the alleged victim is dead, and (2) that the death occurred as a result of a felonious act. The corpus delicti, like other facts, may be shown by circumstantial evidence; it is sufficient if these circumstances are consistent with crime even though they are also consistent with suicide or accident; if it were otherwise it would be impossible in many cases, where there were no eye witnesses, to convict a criminal. *Commonwealth v. Gardner*, 282 Pa. 458, 128 A. 87; *Commonwealth v. Turza*, 340 Pa. 128, 16 A. 2d 401; *Commonwealth v. Johnson*, 162 Pa. 63, 29 A. 280; *Commonwealth v. Coontz*, 288 Pa. 74, 135 A. 538; *Commonwealth v. Bishop*, 285 Pa. 49, 131 A. 657; *Commonwealth v. Jones*, 297 Pa. 326, 146 A. 905; *Commonwealth v. Lettrich*, 346 Pa. 497, 31 A. 2d 155.*

---

*In this case the Court said: ". . . the term corpus delicti with respect to homicide does not require the Commonwealth to produce the body or part of the body of the victim."

In the leading case of *Commonwealth v. Gardner*, 282 Pa., supra, the Court said (page 462) : "In all criminal proceedings it is incumbent on the Commonwealth to establish beyond a reasonable doubt three elements: (1) the occurrence of an injury or loss,—*in homicide, a person deceased*;** (2) a criminal agency,—*in homicide*, for example, that *the death was caused* by a beating, gunshot or *circumstances indicating a felonious act* (these two combined show a crime has been committed by someone) ; (3) that the defendant is the responsible party. Defendant contends that the crime for which he is charged was not committed. . . . The person for whose death a prosecution is instituted may be alive, so evidence that he or she is in fact dead is imperative. As death may have resulted from a cause other than a felonious act, there must be evidence that it occurred under circumstances which point to the commission of a crime. In this manner the corpus delicti is shown. . . . 4 Wigmore, Evidence, 2d ed., sec. 2072, pp. 410, 412; Grant v. Com., 71 Pa. 495, 505; Johnson v. Com., 115 Pa. 369, 391; Cox v. Com., 125 Pa. 94, 102; Com. v. Bell, 164 Pa. 517; Com. v. Russogulo, 263 Pa. 93, 108. . . . It sometimes happens the circumstances attending the act may be consistent with crime, suicide or accident. In such cases, *the corpus delicti is proven where the circumstances attending the death are consistent with crime*, though they may also be consistent with accident (Commonwealth v. Johnson, 162 Pa. 63), or suicide (Zell v. Com., 94 Pa. 258), and it is not necessary to show by affirmative proof that the latter two possibilities do not exist before evidence as to who did the act is admitted: Com. v. Puglise, supra, 238."

*Commonwealth v. Jones*, 297 Pa., supra, is analogous on its facts to the instant case. In that case de-

---

** Italics throughout, ours.

fendant's wife, who was alleged to have been murdered, disappeared. Human bones were found in the ashes of a building together with several articles belonging to his wife which were likewise burned and identified. The woman was burned in an unoccupied farmhouse about three miles from defendant's garage. Defendant claimed that his wife had accidentally shot herself and there was no proof of the corpus delicti. The language of the Court's opinion (page 332) is equally applicable to the facts in the instant case. "We think there was sufficient in the case without the statements made by defendant to warrant his conviction. The proofs established that he was the last person seen with his wife, that partly burned bones shown to be those of a human being were found in the burned house in connection with articles of jewelry worn by her, and that in the cellar of their residence, which was occupied by no one except him, burned articles of wearing apparel belonging to her were discovered. These circumstances in themselves were sufficient to establish a criminal agency in causing her death. That he attempted to destroy what he must have deemed to be incriminating evidence against himself by burning it in the heater is a circumstance from which guilt may be inferred: 2 Wharton, Criminal Evidence, section 748, p. 1490 et seq.; Com. v. Marion, 232 Pa. 413, 423. On the witness stand defendant testified his wife was not at home when he reached there from the garage about 10:30 and that he did not see her after that time, thus showing that his previous statement that he saw her on Saturday morning was false. This untrue statement was a circumstance indicating guilt. *'The fabrication of false and contradictory accounts by an accused criminal, for the sake of diverting inquiry or casting off suspicion, is a circumstance always indicatory of guilt.'* Com. v. Spardute, 278 Pa. 37, 43." See

to the same effect *Commonwealth v. Danarowicz*, 294 Pa. 190, 144 A. 127; *Commonwealth v. Hadok*, 313 Pa. 110, 169 A. 111; *Commonwealth v. Karmendi*, 328 Pa. 321, 328, 195 A. 62; *Commonwealth v. Jones*, 341 Pa. 541, 19 A. 2d 389; *Commonwealth v. Lettrich*, 346 Pa. 497, 31 A. 2d 155; *Cathcart v. Commonwealth*, 37 Pa. 108, 113; *McMeen v. Commonwealth*, 114 Pa. 300, 306, 9 A. 878; *Commonwealth v. Johnson*, 162 Pa. 63, 29 A. 280.

" 'Possession of the fruits of crime is of great weight in establishing the proof of murder, when that crime has been accompanied with robbery' ": *Commonwealth v. Newman*, 276 Pa. 534-540, 120 A. 474. See also *People v. Galbo*, (Justice CARDOZO) 2 A.L.R. 1220, 1224, 1225.

Flight, manifestations of mental distress, fear at the time of or just before or just after discovery of the crime, an attempt to commit suicide at such time, as well as evidence to prove motive, intent, plan or design are admissible. Cf. *Commonwealth v. Giacobbe*, 341 Pa. 187, 19 A. 2d 71; *Commonwealth v. Boschino*, 176 Pa. 103, 34 A. 964; *Commonwealth v. Del Giorno*, 303 Pa. 509, 154 A. 786; *Hester v. Commonwealth*, 85 Pa. 139; *McManus v. Commonwealth*, 91 Pa. 57; *McMeen v. Commonwealth*, 114 Pa. 300, 306; *Commonwealth v. Minoff*, 363 Pa. 287, 69 A. 2d 145, and other cases cited in *Commonwealth v. Truitt*, 369 Pa. 72, 81, 90, 85 A. 2d 425; *Commonwealth v. Marshall*, 287 Pa. 512, 135 A. 301; *Commonwealth v. Guida*, 298 Pa. 370, 148 A. 501.

Defendant contends that a new trial should be granted because the verdict was against the weight of the evidence. The evidence was not only ample but, we believe, overwhelming to prove defendant guilty of murder in the first degree; indeed, we fail to see how the jury could have arrived at any other verdict.

One other contention remains to be considered. The jury when polled returned a verdict of "guilty of murder in the first degree and the death penalty"; or "guilty of murder in the first degree and the penalty of death." The jury thus returned a proper verdict and one which was in accord with the law. Unfortunately, the Clerk said "you say you find the prisoner at the Bar, Charles Homeyer, guilty of murder in the first degree and recommend the death penalty." The verdict was recorded as the Clerk announced it and not as the jury rendered it.

"A recommendation" of death, as the defendant correctly contends, is not a "fixing of the death penalty" in accord with the law. *Commonwealth v. Petrillo,* 338 Pa. 65, 12 A. 2d 317. However, it would be a travesty on justice to hold, especially after such a horrible crime, that an error of a clerk could not be corrected, or that an erroneous entry or recording could not be cured. As the Court below wisely said: "A clear unquestionable verdict should not be prejudiced [or invalidated] by an improper recordation of it. Here there can never be any doubt as to the verdict of this jury." The Court then corrected the Court Record of the verdict to read exactly as the jury found. This was in accord with both justice and the law. Cf. *Commonwealth v. Troup,* 302 Pa. 246, 254, 153 A. 337; *Commonwealth v. Hafner,* 89 Pa. Superior Ct. 173; *Commonwealth v. Petrillo,* 338 Pa. 65, 93-94, 12 A. 2d 317; *Commonwealth v. Minoff,* 363 Pa. 287, 69 A. 2d 145.

We have considered all of the other contentions of the defendant and find no merit in any of them. They, together with his 70 additional contentions have been convincingly answered in the painstaking and able 140-page opinion of President Judge LITTLE.

The sentence and judgment are affirmed.