## Commonwealth v. McSorley (No. 2)

*Huette F. Dowling*, District Attorney, *Vincent G. Panati*, Special Deputy Attorney General and *Mary E. Hoerner*, Assistant District Attorney, for Commonwealth.

*Dickie, McCamey, Chilcote, Reif & Robinson, Shelley, Reynolds & Lipsett*, and *Warren G. Morgan*, for defendant.

KREIDER, J., July 28, 1958—Defendant, G. Franklin McSorley, was convicted by a jury of misbehavior in office while chairman of the Pennsylvania Turnpike Commission. Thereafter he filed motions in arrest of judgment and for a new trial which are now before us. At the argument before the court en banc counsel for defendant with refreshing candor conceded, as their motions also indicate, that there is only one question to be decided in this case; that is: Was the evidence sufficient to sustain a verdict of guilty?

A consideration of this question necessarily requires an outline of the evidence and a determination whether or not the jury, having found the facts adduced by the Commonwealth, had a sufficient basis upon which to rest a conviction. As stated by Judge Reno, in speaking for the Superior Court in Commonwealth v. Schuster, 158 Pa. Superior Ct. 164, 165 (1945):

"Defendant's challenge to the sufficiency of the evidence produced to convict him requires a statement of the facts developed on the trial in the light most advantageous to the Commonwealth, in whose favor the jury's verdict resolves all controverted factual questions and the reasonable inferences to be taken from the testimony of record. Com. v. Kauffman, 155 Pa. Superior Ct. 347, 38 A. 2d 425."

That court speaking through the same jurist, made a similar declaration in Commonwealth v. Kauffman, 155 Pa. Superior Ct. 347, 348 (1944), citing Commonwealth v. Mezick, 147 Pa. Superior Ct. 410, 24 A. 2d 762 (1942).

The indictment in the instant case charged that defendant McSorley while acting as commissioner and chairman of the Pennsylvania Turnpike Commission ". . . did then and there, wilfully misbehave himself in said office in that he knowingly, wilfully and corruptly procured, permitted and allowed Daniel J. Dalto, an employee of the Pennsylvania Turnpike Commission, to work in and for and to render services exclusively to Thomas J. Evans, former Chairman of the said Commission, his family, associates and the friends of said Thomas J. Evans, at divers places, both within and outside the Commonwealth of Pennsylvania, for a continous period from approximately July 1, 1955, to March 1, 1956, while the said Daniel J. Dalto was listed on the payroll of the Pennsylvania Turnpike Commission, and was being paid with corporate funds of the Pennsylvania Turnpike Commission, to the amount of $2,800.00, as an employee of said Pennsylvania Turnpike Commission, for which moneys the said Commonwealth received no services, work or benefits, to the prejudice and great damage of the Pennsylvania Turnpike Commission, and to the great scandal, dishonor and prostitution of the Public Justice of said Commonwealth, to the evil example of all others in like case offending and against the peace and dignity of the Commonwealth of Pennsylvania."

The jury could have found from the evidence, and unquestionably did find, that when the term of Thomas J. Evans as member and chairman of the Pennsylvania Turnpike Commission expired July 1, 1955, defendant, G. Franklin McSorley, who became his successor, directed William H. Cooper, superintendent

of equipment and in charge of the five chauffeurs and vehicles of the Turnpike Commission, to assign a commission chauffeur and an automobile for the purpose of transporting Evans to his home in Coaldale, Schuylkill County, Pa. Cooper testified:

"Mr. McSorley told me that he had given Mr. Evans the car and Dalto for a while."

From that date until on or about March 1, 1956, Daniel J. Dalto, the chauffeur thus assigned to Evans, remained at Coaldale and acted as the private chauffeur for Evans *but did no work whatsoever for the Pennsylvania Turnpike Commission which, nevertheless, continued to pay him* at the rate of $350 per month, or a total of *$2,800* for the eight months period in question. Dalto testified that he did no work for the Turnpike Commission during that period and merely returned to its offices at Harrisburg to collect his pay check every two weeks. Cooper, who was the immediate superior of Dalto, testified he gave him no work assignments during that time.

When Evans and Dalto left Harrisburg on July 1, 1955, to go to the home of Evans at Coaldale, they proceeded in a Cadillac automobile owned by the Pennsylvania Turnpike Commission. A similar vehicle had previously been assigned to Mr. Evans during the last three years of his term as chairman of the commission and during that period Dalto had been his driver. Upon arrival at Coaldale, Evans instructed Dalto with respect to his duties which in general required him to be on hand constantly to drive Evans wherever the latter wished to go and do anything that Evans wanted him to do. During the latter part of July 1955 the Cadillac car was returned to the commission at Harrisburg and thereafter Dalto usually used his own Oldsmobile sedan for any driving he was directed to do by Evans.

Dalto testified that upon arriving at Coaldale *"anything Mr. Evans wanted me to do I did for him. Wherever he wanted to go, I drove him.* . . . I received those (instructions) from Mr. Cooper before we left Harrisburg." Dalto said that on a typical day he would drive Evans to the neighboring town of Lansford or to Tamaqua or Harrisburg and that he also drove him to Frackville or Pottsville once a week or once every two weeks. During this period Dalto also acted as chauffeur for Richard Evans, the son of Thomas J. Evans. Dalto said he drove Richard Evans to the office of the Manu-Mine Research and Development Company in Reading, Pennsylvania. Richard Evans was the vice president and a stockholder of Manu-Mine. Once or twice Dalto drove Thomas J. Evans to the office of that company.

During the month of October 1955, Dalto drove Thomas J. Evans, Richard Evans and their wives to the World Series in New York City. A 1955 Chrysler Imperial sedan was used for the trip. Dalto testified that on one occasion during Evans' five day stay in New York, he was present when Mr. McSorley came to the rooms occupied by the Evans families on the thirty-second floor of the Waldorf-Astoria Towers and that during the course of the conversation McSorley asked Thomas J. Evans "If I was doing everything that Mr. Evans wanted me" to do. "If not, I had to answer to him (McSorley) about it."

In December of 1955 the same group went to the Pennsylvania Society Dinner in New York City. Mr. Dalto drove the car for Thomas J. Evans and again saw Mr. McSorley in the Waldorf-Astoria Hotel. *On this occasion McSorley, as he had done previously, inquired of Thomas J. Evans whether or not Dalto was doing everything for Evans that Evans wanted him to do.*

On January 9, 1956, Thomas J. Evans directed Dalto to go to the Adelphia Hotel in Philadelphia where he was to meet Richard Evans and drive him and the members of Richard Evans' family to their home in Coaldale, Pa. The same Chrysler car was used for this trip. Dalto learned later that the *Chrysler Imperial* which he had been driving *was titled in the name of the Manu-Mine Research and Development Corporation.* On their way to Coaldale the car occupied by the Evans family became involved in an accident which resulted in serious injuries to Richard Evans and caused his death on or about January 16, 1956. Dalto received injuries of a minor nature and was taken to the Coaldale State Hospital. He remained there from January 9, 1956, through January 13, 1956.

On January 18, 1956, at the viewing of Richard Evans in a funeral home at Lansford, Pa., Dalto saw McSorley in the presence of Thomas J. Evans and *McSorley again inquired of Evans whether Dalto was doing what Evans wanted him to do and said if he did not,* Dalto would have *to account to him* (McSorley). Dalto stated that he continued working for Evans until about March 1, 1956, when he was ordered to return to the commission's offices at Harrisburg. Two weeks later Dalto was dismissed by the Turnpike Commission.

*The Unrequested "Vacation" and "Sick Leave"*

The evidence disclosed that on Tuesday, January 10, 1956 (the morning after the accident in which Richard Evans was injured), his chauffeur, Dalto, was placed on sick leave by Cooper and Roberts without his knowledge or request. Cooper had served under Chairman Evans at the Turnpike Commission since 1941 and Roberts since 1949. Cooper had received word at Harrisburg on the night of the accident on January

9th that Richard Evans was seriously injured and that Dalto was driving Richard's car. McSorley testified that on the night of the accident to Richard Evans,

". . . They (his office) telephoned that information to me, at Pittsburgh. They telephoned to me and said Mr. Evans' son has been injured in a very serious traffic accident. I told him I was sorry to hear it. *A little later they called me again and told me that Dalto was driving the car.* I said *'that is unfortunate'* and I asked 'was he hurt', and they did not know; and I was coming to Harrisburg for the meeting the next day."

Cooper testified he met McSorley in his office shortly after the latter's arrival at Harrisburg the morning after the accident, "and I suggested to him that I would place Mr. Dalto on sick leave. He had sick leave coming to him, and he was in the hospital. . . . Mr. McSorley said it was all right with him, I guess; I don't know, I don't just remember his specific words. . . . I suggested it, and I went to the personnel department and got a sick leave card for him. . . . *I thought it would be a good idea for him to be on sick leave.*"

When asked whether he knew what Dalto was doing at the time of the accident Cooper replied:

"A. Well, he was driving Dick Evans the day of the accident. He was driving a Chrysler car.

"Q. You say that Daniel Dalto was driving that car?

"A. *That is what was reported,* yes sir."

When he left the office of Chairman McSorley on January 10, 1956, Cooper proceeded to the office of William J. Roberts, the comptroller of the Turnpike Commission, "and told him we were putting Dalto on leave". Cooper testified he gave a blank leave slip to Roberts and Roberts then wrote Dalto's name on the application for a *one-day vacation* and dated the application January 6, 1956 (which was three days *prior* to the accident), but the actual vacation date sup-

posedly requested was January 9, 1956, which was the date of the accident, as above stated. In addition, four days sick leave were added to this leave slip by Roberts in accordance with instructions given him by Cooper. The following Friday, January 13, 1956, Cooper went to Coaldale, visited Dalto in his home and advised him for the first time that he had placed him on sick leave for four days.

After January 13, 1956, Dalto continued to serve Thomas J. Evans until March 1, 1956, when he was directed to return to the Pennsylvania Turnpike Commission office in Harrisburg. From January 13th until that time *Mr. Cooper gave Dalto no directions as to what work was to be done,* nor did Mr. Cooper see Dalto other than when Dalto called for his salary checks at the Harrisburg office. Near the end of February or the early part of March, 1956, *McSorley told Cooper to bring Dalto back to Harrisburg* and keep him in Harrisburg. Following these instructions, Dalto was directed to return to Harrisburg at once. He returned about March 1, 1956, and *within two weeks thereafter he was dismissed,* as heretofore stated. McSorley, in testifying months afterward before the investigating grand jury, said: "I don't know whether he (Dalto) was discharged or not," and Cooper testified at the trial that "the only thing I know about it is he got a letter from the personnel department with Mr. Erickson's signature on it terminating his services". McSorley admitted, however, that the investigation of the Pennsylvania Turnpike Commission by the Department of Justice was in progress at the time he ordered Dalto to return to Harrisburg.

### Discussion

The General Assembly has constituted the Pennsylvania Turnpike Commission an instrumentality of the

Commonwealth, and we think that a member of the Turnpike Commission is a public officer.

". . . The commission is hereby constituted an instrumentality of the Commonwealth, and the exercise by the commission of the powers conferred by this act in the construction, operation and maintenance of the turnpike shall be deemed and held to be an essential governmental function of the Commonwealth. . . .": Act of May 21, 1937, P. L. 774, sec. 4, 36 PS §652d.

As above stated, defendant was indicted for the common law offense of misbehavior in office. The broad prohibitory sanctions of the common law are well illustrated in Commonwealth v. McHale, 97 Pa. 397 (1881), where the Supreme Court, speaking through Mr. Justice Paxson, said, page 408:

"What is a common-law offence?

"The highest authority upon this point is Blackstone. In chap. 13, of vol. 4, of Sharswood's edition, it is thus defined: 'The last species of offences which especially affect the Commonwealth are those against the public police or economy. By the public police and economy I mean the due regulation and domestic order of the kingdom, whereby the individuals of the state, like members of a well-governed family, are bound to conform their general behavior to the rules of propriety, good neighborhood and good manners, and to be decent, industrious and inoffensive in their respective stations. This head of offences must therefore be very miscellaneous, as it *comprises all such crimes as especially affect public society*, and are not comprehended under any of the four preceding series. These amount some of them to felony, and others to misdemeanors only.' " (Italics supplied.)

In the McHale case, defendants were charged with intending to procure a false count and return of the votes cast by the electors. The district attorney, who was one of the alleged beneficiaries of the fraudulent

count, refused to sign and send before the grand jury the bills of indictment prepared by the private counsel for his adversary. The Schuylkill County Court then appointed a special district attorney to prosecute the case. The latter presented the indictments to the grand jury and a true bill was found in each case. Subsequently the lower court quashed the indictments but the Supreme Court reversed and held that defendants, by committing acts which struck at the purity and fairness of elections, had committed a crime at common law, which was punishable as a misdemeanor. The Supreme Court, at page 410, stated:

"We are of opinion that all such crimes as especially affect public society are indictable at common law. *The test is not whether precedents can be found in the books, but whether they injuriously affect the public police and economy.*" (Italics supplied.)

Another leading case on the common law offense of misbehavior in office is Commonwealth v. Brownmiller, 141 Pa. Superior Ct. 107 (1940), affirming Commonwealth v. Brownmiller, 48 Dauphin 255 (1939). There, defendant, who was the Secretary of the Department of Highways of Pennsylvania, was convicted of misbehavior in office. The Commonwealth charged that he had willfully, knowingly and corruptly misused and wasted public funds for political purposes and, having knowledge of the waste and misuse of said funds, neglected and refused to perform the duties of his office by failing to investigate and *terminate* said corrupt practices. The evidence indicated, inter alia, that 368 men could normally maintain 734 miles of State Highways in Luzerne County; that after the funds for normal maintenance were about exhausted, the appropriation was overdrawn by $250,000; that Brownmiller had notice of this situation and that 9,000 men were on the payroll there and that such a number was unjustifiable for the maintenance

work; that on October 18, 1938, there were 10,400 men employed on the highways of Luzerne County; that on October 26, 1938, defendant Brownmiller approved a plan continuing the work in that county and signed a letter authorizing the transfer of funds to the maintenance account of Luzerne County and that until November 7th, the day before the election, the number of men had increased to more than 18,000.

Brownmiller's defense was that he relied on and followed the advice of his assistants and engineers in the Department of Highways. In his opinion refusing to grant a motion in arrest of judgment and for a new trial, Judge (later Mr. Justice) Howard Hughes, specially presiding, held that there was sufficient evidence to show that the action of defendant was *willful* and *corrupt* both in the exercise of his discretionary power and his neglect of duty. This decision was affirmed in Commonwealth v. Brownmiller, supra, in an opinion written by Judge Baldrige who, speaking for the Superior Court, set forth the essence of the crime of misbehavior in office. We think the language there used is applicable to the instant case (pages 120, 121):

"The assignments of error, fifth to tenth, inclusive, allege that the acts and omissions of the defendant were neither corrupt nor wilful were but a valid exercise of official discretion and therefore did not constitute the offense of malfeasance or nonfeasance in office. Neither of these charges, which are sometimes referred to as a misbehavior or misdemeanor in office, has been defined by statute. They are known as common law offenses.

"The basis of both counts in the indictment was a wilful and corrupt misuse and waste of public funds. The first charges, inter alia, as above stated, the wilful and corrupt misuse and waste of public funds for

political purposes and the second charges the defendant with wilfully and corruptly neglecting and refusing to perform the duties of his office by failing to investigate the cause of the illegal expenditures of the fund and cause the termination thereof. Misconduct or malfeasance in office in its penal sense is not merely error in judgment or departure from sound discretion, but the act, omission or neglect must be wilful, corrupt and amount to a breach of duty legally required by one who has accepted public office: Commonwealth v. Brown et al., 116 Pa. Superior Ct. 1, 175 A. 748.

"A discretionary duty must be exercised with reason as opposed to caprice or arbitrary action. 'The very term [discretion] itself, standing alone and unsupported by circumstances, imports the exercise of judgment, wisdom, and skill, as contradistinguished from unthinking folly, heady violence, and rash injustice': Paschall v. Passmore, 15 Pa. 295, 304; Dauphin County Grand Jury Investigation Proceedings (No. 3), 332 Pa. 358, 364, 2 A. 2d 809.

"If the evidence supports the charges in the indictment, and the jury has found it did, the defendant is guilty under the common law: Commonwealth v. Miller, 94 Pa. Superior Ct. 499; Commonwealth of Penna. v. Rosser et al., 102 Pa. Superior Ct. 78, 156 A. 751; McNair's Petition, supra; Commonwealth v. Coyle, 160 Pa. 36, 28 A. 576, 24 L. R. A. 552, 40 Am. St. Rep. 708.

"The proof offered by the Commonwealth was sufficient to establish that the defendant, instead of performing his official duties with a sound discretion to the interest of the Commonwealth, acted capriciously, arbitrarily, and with a wilful and corrupt design."

See Commonwealth v. Rosser, 102 Pa. Superior Ct. 78 (1930), supra, wherein the Commissioners of Luzerne County were convicted of wilful misbehavior in office.

In the instant case, Dalto testified that he performed no services for the Pennsylvania Turnpike Commission, which paid him the sum of $2,800 as his salary from July 1, 1955, to March 1, 1956. His services during that period were rendered to Thomas J. Evans, who was no longer a member of the Turnpike Commission. The fact that defendant McSorley on three occasions between July 1, 1955, and March 1, 1956, publicly acknowledged that Dalto was performing services for Thomas J. Evans was sufficient *under all the evidence* to create an inference that the Pennsylvania Turnpike Commission was receiving no benefit for the salary which was being paid to the chauffeur Dalto, thereby causing a loss to the commission, as aforesaid, of the sum of $2,800. While it is true that it is necessary to show that defendant acted from an evil or corrupt motive, this can be *inferred* from all of the circumstances relating to defendant's order directing Dalto to perform personal services for Evans after the termination of the latter's term of office as a member of the Pennsylvania Turnpike Commission. What was said in the Brownmiller case, 141 Pa. Superior Ct. 107, supra, is peculiarly appropriate here, on page 122:

". . . Permitting the employment of this large number of men and ordering the *payment of their wages from public funds was certainly not for the benefit of the Commonwealth.*

"One cannot escape the conclusion that the action of the defendant was a wilful, arbitrary abuse of discretion, with the corrupt motive to keep a large number of men on the maintenance payroll until the election, November 7, 1938. It was shown also, *in support of the charge that the conduct of the defendant was designed and corrupt,* that *on prior* occasions the payroll of the highway department in Luzerne County was 'padded' in a similar manner, and that the circum-

stances thereof were *known* to him." (Italics supplied.)

It is highly significant that despite the notice defendant received on January 9, 1956, of Richard Evans' fatal accident while the Imperial Chrysler sedan owned by the Manu-Mine Company was being operated by a salaried employe of the Pennsylvania Turnpike Commission, Chairman McSorley *persisted in allowing Dalto to remain as chauffeur for Thomas J. Evans until March 1, 1956,* when the investigation of the Pennsylvania Turnpike Commission by the Department of Justice became more intensified. Furthermore, the manner in which Dalto's "leave" was arranged by Cooper upon leaving Chairman McSorley's office could raise the inference that Dalto's services at the time of the automobile accident were being concealed and made to appear as though Dalto's driving of the Manu-Mine car was on his own time "on his day off", rather than on time for which he was being paid by the Pennsylvania Turnpike Commission. The jury could have found that this was demonstrated by the date which was placed on the leave slip, viz., January 6, 1956, or *three days prior to the date of the accident,* the spurious application for a one-day "vacation" on January 9th and that Dalto was given four days sick leave although he did not request it. It is significant that Cooper and Roberts inserted these dates on the "leave slip" following Cooper's visit to McSorley's office.

### McSorley's Defense

McSorley's defense was that at the time Evans left the commission on July 1, 1955, or immediately thereafter McSorley hired Evans as a consultant to him and that all Evans desired as compensation was the use of a car and a driver. Evans was not an engineer but had served on the commission for about 16 years. McSorley testified that he was inexperienced and re-

spected Evans' judgment. However, there was evidence that there were about 25 skilled engineers in the employ of the Pennsylvania Turnpike Commission whose services and advice McSorley could have had for the asking because such services were in line of their duty. McSorley testified on cross-examination he told his subordinate Cooper that "the Commission had agreed to let Mr. Evans move out his personal effects and to give him a car and a driver. . . . I said: 'Give him a car and a driver to move out his personal effects. He has accumulated a lot over the years and he will be back here in about a week to see me,' and that is about all I said to him." McSorley also testified that "to my best recollection, the day that Mr. Evans left the Commission, we hadn't made any arrangement for him to do anything at that time with me". When asked whether he subsequently talked to Cooper with regard to another arrangement, McSorley replied: "I do not specifically remember telling him again about it. I think the first time was all I ever talked to him."

McSorley testified that after Evans left the commission his employment by McSorley was approved orally by Commissioners Torrance and Watson. *No mention of such an alleged arrangement appeared in the minutes of the Turnpike Commission.* McSorley said no letter was ever written by him to Evans or by Evans to him concerning the services Evans was supposed to perform and that he and Evans conferred solely by telephone. Commissioner Watson died before the trial began and *neither former Commissioner Evans nor Commissioner Torrance was called as a witness by McSorley to corroborate him nor was their absence explained.*

When McSorley testified before the investigating grand jury of Dauphin County on December 19, 1956, he made no mention whatever of the alleged hiring of

Evans as a consultant and the use of a Turnpike Commission car and driver as compensation for his services. McSorley was asked:

"Q. Was Richard Evans driving his own car at the time, to the best of your knowledge?

"A. No, he was not. He was driven by a man who is and was at that time of Richard Evans' death, driving for the Commission. *I understand* that *the man had driven for Mr. Evans* and his son from *time to time on his day off and on weekends when he was not working*, and *they had employed him to drive the car*, at least, from the information I received and from what they told me about it.

"Q. What was the man's name?

"A. Dalto. That is what they told me when they called me in Pittsburgh: On his day off."

When testifying further before the grand jury with respect to the chauffeur Dalto, McSorley was asked:

"Q. But he was driving the car at the time?

"A. I understand he was. I think the records will show that.

"Q. He was a Commission employee?

"A. He was at the time.

"Q. He has been discharged?

"A. *I don't know whether he was discharged.* He worked for some time after that. He was injured in the accident, and then he came back to work there for a while, and then—*I don't know whether he was discharged or not.* He isn't there any more. He has not been there for—I just can't say how long. I can't say how long he stayed after that. He stayed there for a while.

"Q. How long did Mr. Evans have him?

"A. *He worked for Mr. Evans. He hired him.*"

Mr. McSorley was cross-examined at the trial with respect to his grand jury testimony, as follows:

"Q. How do you explain that, sir, in the face of your testimony that you were the one—

"A. I don't—

"Q. May I finish the question?

"How do you explain that, sir, when you are the one who said that you had Mr. Cooper assign a driver to Mr. Evans in return for the assistance that you say he was giving you?

"A. *I must have been mixed up or something, I don't know.*

"Q. That is your answer?

"A. I must have been. I told you he was working for the Commission in the sentence before that, a question or two before that. There is no doubt about that. It is just a question or two before that I said he was working for the Commission."

When asked at the trial why he had recalled Dalto to Harrisburg, McSorley replied:

"I was going over some memos in my file when I returned from my vacation in Florida the latter part of February, and I asked Cooper if Dalto was still working for Evans, and he said he thought he was. I said, '*Well, he better come back.*' . . . '*I don't think we have any further use for that arrangement. If he has, let Mr. Evans request him again.*' That was the end of it."

McSorley was then asked:

"Q. How long before Dalto was recalled had you talked to T. J. Evans?

"A. *I don't think I talked to him—only once before.* Of course, you know, after the funeral, as I recall, I went away right after that. You see, I went away twice. I went away to a convention first, and then I came back, and I am not sure, I can't remember whether I came to Harrisburg again and went home or went right back to Florida with my wife. I just

don't remember. It was either one way or the other: Either came back for a day or I didn't."

The jury could have considered it significant that Dalto was supposedly dismissed without the knowledge or consent of McSorley, despite the fact that defendant had personally ordered his return to Harrisburg only two weeks prior thereto; and that in ordering Dalto's return, McSorley, in effect, cancelled Evans' alleged contract of employment without the prior knowledge and consent of his fellow commissioners, Torrance and Watson (and without notice to Evans), although McSorley had testified that they had joined him in making that oral agreement. Moreover, the jury had the right to consider the failure of McSorley to call Evans and Torrance to corroborate him or to explain their absence. The jury also could have found that if such a contract actually existed and was as important to defendant and the Turnpike Commission as McSorley asserted at the trial, it would seem unlikely that McSorley would or could casually set aside Evans' right to a driver thereunder by merely giving an informal order to Cooper for Dalto's return while Cooper was driving McSorley to his office from the Harrisburg Airport. It was also for the jury to evaluate the testimony of Cooper who, though Dalto's immediate superior, testified in substance that he had no knowledge of the reason for Dalto's dismissal.

Victor H. Wright, deputy attorney general, testified that he assisted in the investigation of the Pennsylvania Turnpike Commission by the Pennsylvania Department of Justice; that he called on McSorley and directed his attention to the fact that Dalto, a Turnpike Commission employe, was driving an automobile owned by The Manu-Mine Research and Development Company at the time of the accident in which Richard Evans was involved and that he had summarized his

investigation in a memorandum which he presented to Mr. McSorley. Mr. Wright testified:

". . . As I had said, I was sitting beside Mr. McSorley's desk while he was reading this memo. When he came to this particular item, the one referring to Dalto, he chuckled and said to me, *'There is nothing to that. I know all about that. He came to me'*—

"Q. Who?

"A. I am still quoting Mr. McSorley to the best of my recollection.

" *'He came to me'*—meaning Dalto—'and told me that he *had an opportunity to pick up a few extra dollars driving somebody if he could have that day off.* I could see nothing wrong with it and *told him it was perfectly all right.'*

"That was the entire conversation between Mr. McSorley and me on the subject of Daniel J. Dalto at that time."

Deputy Attorney General Wright also testified in response to a question put to him on cross-examination that he did not find McSorley coöperative in the investigation.

From the recital of the foregoing facts, we think it cannot be seriously questioned that there was sufficient evidence to warrant the jury's verdict. Mr. Justice Bell, in speaking for the Supreme Court in Commonwealth v. Phillips, 372 Pa. 223 (1953), at page 227, said:

". . . The facts themselves clearly show how implausible this part of his testimony is. *There is no requirement that either the jury or a Court must believe the accused.* The sole requirement is that there be sufficient evidence to justify the jury's verdict: Commonwealth v. Logan, 361 Pa. 186, 191, 63 A. 2d 28. It has become customary for a defendant in his argument before an Appellate Court to base his claims

and contentions upon *his own testimony* or that of his witnesses *even after a jury has found him guilty. This,* of course, *is basic error. After* a plea or *verdict* of guilty, '*we accept as true* all of the Commonwealth's evidence upon which, if believed, the jury *could* have properly based its verdict: Commonwealth v. Blanchard, 345 Pa. 289, 296, 26 A. 2d 303, 306 (1942) . . .' " And other citations appended thereto. (Italics supplied.)

Defendant's counsel argues, in effect, that the Commonwealth has not shown beyond a reasonable doubt that defendant had any criminal intent or corrupt motive. They seem to base their argument on their statement that "McSorley received no personal gain" in assigning Dalto as a chauffeur to Evans. We think defendant's contention cannot be sustained. The jury's verdict establishes the fact that this was a private arrangement between McSorley and Evans for the benefit of Evans and not related in any manner to the business of the Pennsylvania Turnpike Commission or the interest of the turnpike bondholders or the general welfare of the people of Pennsylvania. The verdict also establishes that defendant intended to, and did, bestow a substantial benefit upon Evans at a time when Evans was no longer connected with the Turnpike Commission or the State Government in any manner. In fact, he was a total stranger to it after he severed his connection with the Turnpike Commission on July 1, 1955. Thereafter, defendant McSorley had no more right to bestow $2,800 worth of free services upon Evans by supplying him with a private chauffeur for eight months at the expense of the public than he would have had a right to give Evans $2,800 in cash from the funds of the Pennsylvania Turnpike Commission.

A public officer cannot give away the public's lands,

goods *or services* to another and then claim immunity for himself on the ground that he had no corrupt motive. Such a doctrine, if upheld, would open wide the door to fraud and certainly would be in violation of defendant's constitutional oath of office, viz., "I. G. Franklin McSorley, . . . do solemnly swear . . . that I will discharge the duties of my office *with fidelity; . . .*"

In the Brownmiller case it was not shown or contended by the Commonwealth that Brownmiller as Secretary of Highways received any personal gain in return for his unlawful acts. Nevertheless, Brownmiller's conviction on the charge of misbehavior in office was upheld by the Superior Court and allocatur refused by the Supreme Court.

We think the jury in the instant case had sufficient evidence before it from which it could find a criminal intent and a corrupt motive on the part of defendant. In Commonwealth ex rel. Garrison v. Burke, 378 Pa. 344 (1954), Mr. Justice Bell, speaking for the Supreme Court, said on pages 348-349:

". . . It is clearly settled that a man may be convicted on circumstantial evidence alone, and a criminal intent may be inferred by the jury from facts and circumstances which are of such a nature as to prove defendant's guilt beyond a reasonable doubt: Commonwealth v. Kloiber, 378 Pa. 412, 106 A. 2d 820; Commonwealth v. Homeyer, 373 Pa. 150, 94 A. 2d 743; Commonwealth v. Lowry, 374 Pa. 594, 600, 98 A. 2d 733; Commonwealth v. Danz, 211 Pa. 507, 60 A. 1070; Commonwealth v. Wentzel, 360 Pa. 137, 61 A. 2d 309."

After careful consideration of the oral arguments and briefs submitted by defendant's counsel and by the Attorney General of the Commonwealth and the District Attorney of Dauphin County, we are of the opinion that the motions in arrest of judgment and

for a new trial cannot be sustained and should be dismissed.

And now, July 28, 1958, defendant's motions in arrest of judgment and for a new trial are overruled and dismissed and the District Attorney is directed to call defendant for sentence on Tuesday, August 5, 1958, at 10 a.m.