J-A25045-24

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| JOSEF CHARLES RASZLER | : | |
| | : | |
| Appellant | : | No. 2675 EDA 2023 |

Appeal from the Judgment of Sentence Entered May 11, 2023
In the Court of Common Pleas of Lehigh County
Criminal Division at No(s): CP-39-CR-0001992-2017

BEFORE: OLSON, J., DUBOW, J., and SULLIVAN, J.

MEMORANDUM BY SULLIVAN, J.: **FILED DECEMBER 2, 2025**

Josef Charles Raszler ("Raszler") appeals from the judgment of sentence following his jury conviction of first-degree murder.[1] On appeal, Raszler challenges the denial of his motion *in limine* to introduce evidence of third-party culpability, the denial of his motion to suppress, and the sufficiency and weight of the evidence. Because Raszler's claims do not merit relief, we affirm.

We take the underlying facts and procedural history in this matter from the trial court's opinion. In September 2016, the Pennsylvania State Police ("PSP") were called to a residence after a report of a bleeding, unresponsive woman lying in a driveway. The police ascertained Stephanie Roof ("the victim") had been discovered by her boyfriend, Shawn Cooper, lying in her

_____

[1] 18 Pa.C.S.A. § 2501(a).

driveway. First responders found what appeared to be a gunshot wound in the victim's chest; they transported her to the hospital, where she was pronounced dead. *See* Trial Court Opinion, 1/5/24, at 2-3.

PSP Troopers executed a search warrant at the victim's home and located a metallic projectile in her front yard. They also saw damage, consistent with a projectile strike, on the lower part of her garage door. Later investigation ascertained that the projectile was homemade. *See id*. at 3.

During their search of the victim's home, the PSP found greeting cards addressed to the victim and signed by "Joey" and several pieces of mail addressed to Josef Raszler. Police recovered the victim's cellular telephone which contained thousands of text messages between the victim and Raszler, documenting a prior romantic relationship. Raszler lived across the street from the victim. *See id*.

Raszler did not respond to the PSP's attempts to contact him, including by ringing his doorbell on the night of the incident. When he finally spoke with them, he appeared nervous. Raszler initially denied knowing the victim, then admitted he had worked with her but denied anything more than a casual acquaintance with her. *See id*. at 3-4.

After obtaining a search warrant (the "First Search Warrant") for Raszler's home, the police seized multiple computers. The police also found numerous tools and equipment which could be used to make a homemade

weapon, as well as a partially constructed pneumatic air gun and equipment that had been converted to store compressed air. *See id*. at 4.

In Raszler's bedroom, the police found receipts and invoices from several hardware stores and a hand-drawn map showing the measurements between Raszler's house and the victim's home. The troopers also found a note in what appeared to be Raszler's handwriting which stated he needed a "0.5500," which Troopers determined was the diameter of half-inch copper pipe, identical to the diameter of the homemade projectile found at the crime scene. The police also searched Raszler's car pursuant to a warrant and found pieces of PVC piping. *See id*.

Raszler lived with his parents, who allowed troopers to search a remote cabin they owned. In the backyard of the cabin, the police saw a five-foot tall tower made of tarpaulin and wood; there were holes in the tarpaulin. The police located a projectile in woods around the cabin, which was like the projectile found in the victim's yard. Moreover, neighbors told the police they heard noises a few days before the murder that sounded like a pneumatic air- or nail gun. The troopers found air compressors in the cabin similar to the ones in Raszler's house. *See id*. at 5.

Subsequently the police searched Raszler's house again pursuant to a warrant (the "Second Search Warrant"). The police located more tools, equipment, projectiles, and parts which could be used in constructing a homemade weapon. *See id*.

Several months later, pursuant to another warrant (the "Third Search Warrant"), the police again searched Raszler's electronic computers and phone. *See* Application for a Search Warrant, 4/18/17, at cover page.

Prior to trial, Raszler filed an omnibus pretrial motion ("OPTM") and a supplemental OPTM moving to suppress all statements he made to the police and physical evidence seized by them; he also sought supplemental discovery and *habeas corpus* relief. *See* OPTM, 7/19/17, at 1-8; Supplemental OPTM, 12/08/17, at 1-6 (unnumbered). At the OPTM hearing, the parties agreed to the admission of the notes of testimony of the preliminary hearing for the sole purpose of deciding Raszler's *habeas corpus* motion. *See* N.T., 12/15/17, at 5-11. Trooper Steven Furlong ("Trooper Furlong"), the only witness at the suppression hearing, was a part of the criminal investigation unit and helped investigate the case. *See id*. at 17-18. Although Trooper Furlong was involved with the seizure of various electronics in this case, a separate, specialized unit evaluated them. *See id*. at 22. Trooper Furlong was only able to answer general questions about the process by which information is extracted from a cell phone or a computer. *See id*. at 23-49. The suppression court subsequently denied the motion to suppress. *See* Order, 12/17/19.[2]

_____

[2] In its opinion supporting the denial of suppression, the court cited the preliminary hearing testimony of PSP Trooper James Ford ("Trooper Ford"), a digital forensics expert, concerning data extraction. *See* Suppression Court Opinion, 12/17/19, at 8-13. Raszler objects to this because this transcript was solely admitted for purposes of evaluating his *habeas corpus* claim, not

*(Footnote Continued Next Page)*

In March 2021, Raszler filed a motion *in limine* seeking to introduce evidence at trial that Michael Horvath ("Horvath"), who had been convicted of kidnapping and murdering Holly Grim ("Grim"), actually killed the victim. Following a hearing in April 2021, the trial court denied this motion.

Trooper Ford, the expert in digital forensics who examined Raszler's cell phone and Compaq Presario computer police seized from Raszler's home, testified at trial he ascertained that from April to October 2015, Raszler and the victim exchanged nearly 3,400 text messages. The victim ceased communicating with Raszler in July 2015. *See* Trial Court Opinion, 1/5/24, at 5. Despite the victim's termination of texts with Raszler, Raszler texted her 250 more times before she told him to stop texting her or she would call the police. *See* Trial Court Opinion, 1/5/24, at 5-6.

At trial, Trooper Ford also discussed various internet searches on Raszler's computer which concerned guns and gun components, such as "air

_____

suppression. *See* Raszler's Brief at 27. However, Raszler acknowledges the Commonwealth neither cited the preliminary hearing transcript nor relied upon it at suppression, and, additionally, that he did not object below to the suppression court's use of that testimony. *See id*. Thus, Raszler does not challenge the suppression court's use of that testimony but instead asks this Court not to consider it. *See id*.

We agree that the suppression court erred by considering the preliminary hearing transcript with relation to suppression. In accordance with Raszler's request, this Court has not read the preliminary hearing transcript and thus does not rely on the portions of the trial court opinion that cite to and/or rely on the preliminary hearing transcript.

guns," "air gun components," "air rifles over 1800 feet per second," "psi custom pump," "gun barrel rifling tools," "how to put in gun barrel rifling," "high pressure air compressor," and "most powerful P.C.P. air rifle." Trooper Ford also determined Raszler viewed demonstration videos from YouTube pertaining to these types of weapons, searches relating to calculations of force of impact, and formulas to determine density, momentum, mass, and stopping force. Additionally, Raszler searched for the victim's hometown, "Stephanie Roof [the victim] loves Joey," and for the vehicles the victim and her boyfriend drove. *See id*. at 6.

Lehigh County Detective Mark Garrett ("Detective Garrett"), a firearms and tool mark examiner and a PSP Firearms Expert, created a pneumatic gun for demonstrative purposes from the materials the police found in Raszler's house, and the information obtained from Raszler's internet searches. The gun Detective Garrett constructed had the ability to discharge a unique projectile, quite different compared to traditional ammunition, similar to the one found at the victim's home. The gun had the ability to fire a projectile at a speed great enough to kill. Detective Garrett ascertained the projectile found at the cabin and the projectile found at the victim's home were shot from the same homemade firearm. *See id*. at 6-7.

The jury convicted Raszler of first-degree murder and the trial court sentenced him to the mandatory sentence of life without parole. Raszler filed

timely post-sentence motions, which the trial court denied. The instant timely[3] appeal followed.

On appeal, Raszler raises four issues for our review:

I.    Did the trial court err as a matter of law or abuse its discretion in precluding [Raszler] from presenting evidence that [Horvath] . . . was convicted of the first-degree murder of a woman with a homemade gun using homemade ammunition[,] to demonstrate [Horvath] was the perpetrator of the present charges?

II.    Did the trial court err in denying [Raszler's] omnibus pre-trial motion in not suppressing internet search terms that were outside the scope of the search warrant that authorized the seizure of electronic devices?

III.    Was there sufficient evidence to prove that [Raszler] committed the premeditated murder of [the victim] beyond a reasonable doubt when the evidence against him was entirely circumstantial and the Commonwealth failed to establish that assembling and accurately firing a weapon consistent with its theory of the case was even possible[?]

IV.    Was the verdict against the weight of the evidence when [Raszler] testified that the ordinary items found in his basement and cabin the Commonwealth suggested were used to construct a

_____

[3] Although Raszler filed timely post-sentence motions, the trial court did not timely address them and the clerk of courts did not issue an order deeming them denied by operation of law. *See* Pa.R.Crim.P. 720(B)(3)(a) (providing the judge shall decide a post-sentence motion within 120 days or it shall be deemed denied by operation of law); Pa.R.Crim.P. 720(B)(3)(c) (providing that when a post-sentence motion is denied by operation of law, the clerk of courts shall enter an order on behalf of the court that the post-sentence motion is deemed denied). Because Raszler filed his notice of appeal within thirty days of the denial of the post-sentence motion, we deem the appeal timely. *See Commonwealth v. Perry*, 820 A.2d 734, 735 (Pa. Super. 2003) (concluding a breakdown in the court system occurred where the clerk of courts failed to enter an order indicating that the post-sentence motion was denied).

weapon were actually acquired and used for a variety of home projects?

Raszler's Brief at 5 (capitalization and punctuation regularized).

In his first issue, Raszler challenges the trial court's denial of his motion *in limine* seeking to introduce evidence of third-party culpability. **See** Raszler's Brief at 18-21.

We begin with our standard of review:

> When ruling on a trial court's decision to grant or deny a motion *in limine*, we apply an evidentiary abuse of discretion standard of review. An abuse of discretion may not be found merely because an appellate court might have reached a different conclusion. Instead, an abuse of discretion occurs only where the trial court has reached a conclusion that overrides or misapplies the law, or when the judgment exercised is manifestly unreasonable, or is the result of partiality, prejudice, bias or ill-will. Further, to the extent we are required to review the trial court's conclusions of law, our standard of review is *de novo* and our scope of review is plenary.

**Commonwealth v. Cook**, 231 A.3d 913, 919 (Pa. Super. 2020) (internal quotation marks and citations omitted). "[E]vidence of a third person's guilt offered by a defendant is admissible if it is relevant pursuant to Pa.R.E. 401 and not otherwise excludable pursuant to Pa.R.E. 403." **Commonwealth v. Yale**, 249 A.3d 1001, 1004 (Pa. 2021) (footnotes omitted).

> In the case of third person guilt evidence, the relevant inquiries into admissibility are: Does the third person guilt evidence have a tendency to make the existence of any fact that is of consequence to the determination of the issue, *e.g.*, the defendant's culpability, more probable or less probable than it would be without the evidence. If so, is the probative value of the third person guilt evidence outweighed by any danger of confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence.

*Id*. at 1022 (internal citations, quotation marks, and footnote omitted). In deciding whether the evidence is admissible it must be "sufficiently similar." *Id*. at 1024.

> Ultimately, the question is whether the evidence supports an inference that the defendant did not commit the crime and someone else did. The more detailed the similarity, the more likely a finding of relevance. But a lesser level of detail combined with other circumstances attendant to the crime charged and the third person's relationship to it are also pertinent considerations. So too are the temporal factors relative to the third person's bad acts and the crime charged. Trial courts regularly exercise discretion in determining the relevancy of evidence. We discern no need to tie the hands of trial judges by appending an adjective to the degree of similarity required for making a relevancy determination.

*Id*.

Raszler contends the trial court erred in denying his motion *in limine* to introduce evidence of third-party culpability. *See* Raszler's Brief at 18-21. Raszler argues the trial court did not apply the proper standard, as enunciated in *Yale*. *See id*. at 21. Raszler maintains Horvath's murder of Grim was sufficiently like the facts of the instant matter. *See* Raszler's Brief at 20-21. He notes both murders were meticulously planned, the victim lived within four miles of the place where Horvath kidnapped Grim, both victims were stalked, Horvath, Grim, the victim, and Raszler all worked for the same employer, and Horvath was stopped for a DUI near the victim's home.[4] *See id*. at 20.

---

[4] We note that while the Commonwealth presented testimony at the hearing on the motion *in limine*, Raszler did not. Instead, Raszler entered into
*(Footnote Continued Next Page)*

While the facts Raszler cites individually are not necessarily mis-stated, they are contextually imprecise. The reasoning set forth in the trial court's denial of the motion *in limine* is instructive:

These similarities raised by [Raszler] are tenuous at best. While Horvath and [] Grim worked together at Allen Organ for 13 years, Horvath and [the victim] were never employed at the same time. Neither the fact that Horvath and [Raszler] remained friends after working together for 15 years nor that the victims lived near each other offers any support for an [i]nference that Horvath rather than [Razler] killed [the victim]; similarly, that Horvath was arrested near [the victim's] residence does not prove he had any knowledge of where [the victim] lived. The similarities between the homemade firearms found at Horvath's residence and the homemade firearm believed to be used in the [victim's] homicide consist of one thing—that they were homemade. Notably, the weapon used to kill Grim was determined to be a traditional firearm, not homemade. Likewise, the only similarities in the manner of death between Grim and [and the victim] were that they both died from gunshot wounds to the chest. Finally, while there was evidence of "stalking" in the Grim case, no such evidence was present in the [victim's] homicide; and while Horvath kept detailed notes of the women he was stalking, no notes were connected to [the victim] in any way.

The evidence from the Horvath homicide was not sufficiently similar to the present case and is, therefore, not relevant. Additionally, it is likely that presenting details of the Horvath case would only have confuse[d] the issues for the jury.

Trial Court Opinion, 1/5/24, at 8-9.

We do not agree with Raszler that the trial court did not correctly apply the *Yale* standard, it cited to *Yale*, balanced Pennsylvania Rules of Evidence

_____

evidence a number of exhibits pertaining to the Horvath case. *See* N.T., 4/27/21, at 10-19, 48.

401 and 403, and concluded Raszler's evidence was irrelevant and likely to confuse the jury. *See* Trial Court Opinion 1/5/24, at 7-9. As the Commonwealth correctly points out in its brief, Raszler takes his points of similarity out of context. *See* Commonwealth's Brief at 18-24. At the hearing on the motion *in limine*, PSP Corporal Joshua Yaworski ("Corporal Yaworski") testified regarding the Horvath case and demonstrated the lack of significant similarities. *See* N.T., 4/27/21, at 26-61. First, Grim was murdered more than three years prior to the victim. *See id*. at 28, 30. Second, Grim was kidnapped and killed at Horvath's residence, not murdered at her home. *See id*. at 30, 36. Third, while both Grim and the victim resided in the same township, Corporal Yaworski noted they lived at opposite ends of a large township. *See id*. at 31. Fourth, Horvath's time working at the same company did not overlap with the victim's and the victim also worked in a different department than Horvath. *See id*. at 31-33. Fifth, both Horvath and Raszler made weapons; however, Horvath's was a traditional gun using gun powder and a traditional bullet, not the pneumatic air weapon and homemade projectile used here. *See id*. at 40-42, 46-51. Sixth, Raszler's claim that Horvath was arrested for DUI near the victim's home is misleading. Horvath was not arrested on a local street in the victim's neighborhood but on Route 222 bypass, a busy state road. *See id*. at 42-43, 58. Also, the evidence from the DUI arrest showed Horvath was not in the neighborhood stalking the victim but driving between his place of employment and a bar. *See id*. at 43.

Seventh, Horvath was a stalker who kept detailed diaries and notes regarding the women he stalked, none of his diaries or notes mentioned the victim. *See id*. at 35-38, 52-53. Lastly, the video recovered from a camera near the victim's home did not show Horvath's vehicle in the vicinity of the murder. *See id*. at 44-45. In sum, there is nothing to show Horvath even knew the victim existed, let alone stalked and murdered her. *See id*. at 39. Thus, the evidence was not admissible under the *Yale* standard. *See Yale*, 249 A.3d at 1022, 1024. Raszler's first issue does not merit relief.

In his second issue, Raszler challenges the trial court's denial of his motion to suppress. He asserts the warrant was unconstitutionally overbroad and the police exceeded the scope of the warrant with respect to the evidence seized from the search of his electronic devices. *See* Raszler's Brief at 21-32.

When reviewing an order denying a motion to suppress evidence,

> [o]ur standard of review . . . is limited to determining whether the findings of fact are supported by the record and whether the legal conclusions drawn from those facts are in error. In making this determination, this [C]ourt may only consider the evidence of the Commonwealth's witnesses, and so much of the witnesses for the defendant, as fairly read in the context of the record[,] . . . which remains uncontradicted. If the evidence supports the findings of the trial court, we are bound by such findings and may reverse only if the legal conclusions drawn therefrom are erroneous.

*Commonwealth v . Gindraw*, 297 A.3d 848, 851 (Pa. Super. 2023) (citation omitted).

> Both the federal and Pennsylvania constitutions protect citizens from unreasonable searches and seizures by requiring search warrants. [*See*] U.S. Const. amend. IV; Pa. Const. Art. I, § 8. The Fourth Amendment requires warrants to be issued

- 12 -

particularly describing the place to be searched, and the person or things to be seized. Similarly, the Pennsylvania Constitution requires that a search warrant describe things to be seized "as nearly as may be" to prevent general, exploratory searches and the seizure of one thing under a warrant describing another. As to what is to be taken, nothing is left to the discretion of the officers executing the warrant.

However, search warrants should be read in a common[-]sense fashion and should not be invalidated by hypertechnical interpretations. This may mean, for instance, that when an exact description of a particular item is not possible, a generic description will suffice. It is permissible to seize things other than those described in the search warrant if they have a reasonable relation to the purpose of the search.

*Commonwealth v. Moser*, 283 A.3d 850, 856-57 (Pa. Super. 2022) (most citations and internal quotation marks omitted). *See also Commonwealth v. Leed*, 186 A.3d 405, 413 (Pa. 2018) (stating search warrants are to be read in a commonsense manner; they are not to be invalidated by hypertechnical interpretations).

A warrant is unconstitutionally overbroad if there is an "unreasonable discrepancy" between the items sought and the items for which there is probable cause to search and seize. The overbreadth doctrine applies equally to a search of digital space as it does for a physical search.

For example, a warrant that authorizes the search and seizure of a flash drive and any contents contained therein, without limitation for non-criminal use of the flash drive would be overbroad. *See Commonwealth v. Orie*, 88 A.3d 983, 1008 (Pa. Super. 2014)[.]

*Id*. at 857 (some quotation marks and most citations omitted).

Regarding the scope of a search warrant, this Court has explained that a warrant must describe with particularity the property to be searched. A

- 13 -

warrant cannot be so ambiguous as to allow the officers executing the warrant to "pick and choose" among an individual's possessions. *See Orie*, 88 A.3d at 1002. The Pennsylvania Constitution requires the description of the item to be searched to be as particular as is reasonably possible. *See id*. at 1002-03. In assessing a warrant's validity, a court first determines for which items probable cause existed. It then measures the sufficiency of the description against the items for which there was probable cause. Where there is an unreasonable discrepancy between the items for which there was probable cause and the description in the warrant, *i.e.*, the description was not as specific as was reasonably possible, the evidence will be suppressed. *See id*.

Raszler alternately claims the First Search Warrant[5] for his digital equipment was overbroad and/or the search by the police for the search terms he used in Google exceeded the scope of the warrant. *See* Raszler's Brief at 21-32.

> The pertinent part of the First Search Warrant sought the following:
>
> [B]ullets, Projectiles, Bullet Casings, Firearms, Firearm Packaging, Firearm Accessories, Firearm Permits, Implements Capable of Launching or Manufacturing Projectiles, ***Documents and Communications as it pertains to the relationship between [the victim and Raszler], including Photos, Letters, Notes, and Cards, cell phones, text messages and any electronic device or computer that is capable of receiving or sending electronic communications.***

---

[5] Raszler does not address the Second or Third Search Warrants in his argument section. *See* Raszler's Brief at 21-32.

> The interior and exterior of the Paul and Carol RASZLER residence, which is located at 6412 Pinecrest Ln., Lower Macungie Twp., Lehigh Co. This residence is described as a white two-story single family home with drab green shutters and a built-in two-car garage. ***The search shall include, but not be limited to, any cabinets, drawers, containers on the property capable of containing evidence relating to the homicide of [the victim].*** The search shall also include all land, curtilage, outbuildings, sheds, garages, or other structures.

First Search Warrant, 9/13/16, at Cover Page (emphases added). The First Search Warrant delineated the following with respect to probable cause:[6] (1) Raszler lived directly across the street from the victim; (2) Raszler did not answer his door despite multiple attempts by the PSP to contact him, and later offered several reasons why he did not hear the ringing of his doorbell overnight; (3) when interviewed the next day, Raszler appeared nervous and agitated; (4) Raszler initially claimed he believed the woman who lived across the street might be "Steph" (an abbreviation for the victim's first name), then claimed he only knew her casually; (5) the victim's next door neighbor refuted Raszler's claim he did not know the victim by recalling a time after the victim's garage caught fire when Raszler asked her, "I guess you know about Steph and I," and declared their relationship had ended, (6) the victim later told that same neighbor Raszler continued to send her text messages after the relationship ended, until she threatened to call the police, (7) the neighbor expressed her belief Raszler was responsible for the fire, and (8) pursuant to

_____

[6] Raszler does not challenge the existence of probable cause.

warranted searches of the victim's home and cell phone, the PSP located romantic greeting cards and gift cards from Raszler to the victim, mail addressed to Raszler, and approximately 3,400 text messages between the two, wherein Raszler expressed his anger and distress at the end of their romantic relationship and claimed the victim, whom he called a "whore," ruined his life and threatened his career.

Our review of the pertinent law demonstrates the courts have not found warrants to search electronic devices to be unconstitutionally overbroad where they contain "self-limiting language" restricting a search to evidence for which there is probable cause. *See Moser*, 283 A.3d at 857. In *Moser*, the defendant sought to suppress documents found in a "Notes" app on his computer that contained information regarding his sexual abuse of a minor, claiming the search warrant was overly broad. *See id*. Moser admitted to the police he communicated with his victim via multiple messaging apps on his cellular phone and the police noted that those same apps could be accessed via a computer. *See id*. at 853-54. The warrant authorized the police to search Moser's phone for:

> Any and all calls/messages/conversations/photos/videos that establish or provide details regarding the nature of the relationship between [Moser] and the victim (RH) relating to violations of Title 18: Section 3121 A(1) – Rape by forcible Compulsion and Title 18: Section 6301A(1)(i) – corruption of a minor and other related charges.

*Id*. at 854. This Court concluded the warrant was not overly broad because it contained limiting language and "did not give the police discretion to search

for *any evidence* of wrongdoing, just those files that were related to the relationship between Moser and R.H." *Id*. at 858 (emphasis added). *Compare, Orie*, 88 A.3d at 1008 (finding overbroad a warrant which allowed the search of a flash drive and "any contents contained therein" without limitation for non-criminal use of the drive).

We see no meaningful difference between the language at issue in *Moser* and the language contained in the First Warrant, which limited the search to "documents and communications *as it pertains to the relationship between [the victim and Raszler]*, including photos, letters, notes, and cards, cell phones, text messages and any electronic device or computer that is capable of receiving or sending electronic communications." First Search Warrant, 9/13/16, at Cover Page (emphases added, capitalization regularized). The warrant's terms limited the permissible scope of the search to evidence relating to the relationship between the victim and Raszler and was supported by ample, independent probable cause that they had a romantic relationship, Raszler blamed her for ending it, was suspected of setting fire to the victim's garage, and continued to harass her by electronic means so extensively that she threatened to contact the police if he continued. Similar to *Moser* no "unreasonable discrepancy" between the items sought and the items for which the police had probable cause to search and seize existed. *Moser*, 283 A.3d at 856. Raszler's contention that the First Search Warrant was unconstitutionally overly broad fails.

Raszler alternately maintains even if the warrant was not overbroad, the PSP exceeded its scope when they viewed his internet search history. This contention lacks merit.

In **Moser**, the defendant contended the police exceeded the scope of the warrant when they searched his Notes app because the Notes were not "messages." **See Moser**, 283 A.3d at 855. In affirming the suppression court's denial of his motion to suppress, this Court first summarized the controlling law:

> [b]oth the federal and Pennsylvania constitutions protect citizens from unreasonable searches and seizures by requiring search warrants. [**See**] U.S. Const. amend. IV; Pa. Const. Art. I, § 8. The Fourth Amendment requires warrants to be issued "particularly describing the place to be searched, and the person or things to be seized." **Commonwealth v. Turpin**, 216 A.3d 1055, 1063–64 (Pa. 2019) (quoting **Maryland v. Garrison**, 480 U.S. 79, 84 (1987)). Similarly, the Pennsylvania Constitution requires that a search warrant describe things to be seized "as nearly as may be" to prevent general, exploratory searches and "the seizure of one thing under a warrant describing another." **Commonwealth v. Waltson**, 724 A.2d 289, 291 (Pa. 1998) (quoting **Commonwealth v. Grossman**, 555 A.2d 896, 899 (Pa. 1989)). "As to what is to be taken, nothing is left to the discretion of the officers executing the warrant." **Commonwealth v. Matthews**, 285 A.2d 510, 514 (Pa. 1971) (emphasis deleted) (quoting **Marron v. United States**, 275 U.S. 192, 196 (1927)).
>
> However, "search warrants should 'be read in a common[]sense fashion and should not be invalidated by hypertechnical interpretations. This may mean, for instance, that when an exact description of a particular item is not possible, a generic description will suffice.'" [**Commonwealth v.**]**Green**, 265 A.3d 541, 550 (Pa. 2021) (quoting **Commonwealth v. Johnson**, 240 A.3d 575, 584–85 (Pa. 2020) (OAJC)). "It is permissible to seize things other than those described in the search warrant if they have a reasonable relation to the purpose of the search." **Commonwealth v. Gannon**, 454 A.2d 561, 565

- 18 -

(Pa. Super. 1982) (quoting *Commonwealth ex rel. Stoner v. Myers*, 185 A.2d 806, 808 (Pa. Super. 1962)). For example, police could seize a kitchen knife during a warranted search for "one pocket knife." *Matthews*, 285 A.2d at 514.

The Court reasoned that the search Moser challenged did not exceed the scope of the warrant:

Here, the affidavit of probable cause in the . . . search warrant described how Moser would contact R.H. through text messages and social media including Facebook Messenger and Snapchat. Accordingly, the warrant was issued to search all the data on Moser's iPhone (and other devices) for "Any and all calls/messages/conversations/photos/videos" concerning his relationship with R.H.

We conclude that the police could seize the Notes in their search under the . . . warrant. The purpose of the search was to recover cellular phone files that showed Moser's relationship with R.H., described as calls, messages, conversations, photos, and videos. The warrant was not limited to files within certain applications, nor did it specify only finalized messages. As [the Commonwealth's expert] testified, people commonly use the Notes Application to compose messages. Under these facts, the Notes had at least a reasonable relation to the purpose of the search, and the suppression court did not err in denying Moser's motion to suppress based on the scope of the warrant.

*Id*. at 856-57 (citation format regularized).

We find *Moser* dispositive. The purpose of the search of Raszler's electronic devices was to recover evidence showing his relationship with the murdered victim (which Raszler had initially denied), for which they had probable cause given their knowledge of Raszler's romantic relationship with her, Raszler's angry and obsessive response to the victim's termination of that relationship, and a neighbor's suspicion he set fire to the victim's garage. *See* First Search Warrant, 9/13/16, at Cover Page and 2-3. As in *Moser*, the

search warrant here **did** limit which applications could be searched and although the description included "Photos, Letters, Notes, and Cards, cell phones, text messages," it was not limited to them. **Id**. Under these facts, Raszler's internet search history reasonably related to the purpose of the search and there was no "unreasonable discrepancy" between the information sought and the internet searches involving how to DIY high powered air guns.[7] **See Moser**, 283 A.3d at 856-57. These search terms related to the relationship between Raszler and the victim, namely Raszler's threatening and menacing relationship with the victim after she no longer wanted to be romantically involved with him. Thus, it related to their connection and his obsession with the victim and was not unreasonably inconsistent with the requests put forth in the search warrant. Raszler's second issue merits no relief.

In his third issue, Raszler challenges the sufficiency of the evidence underlying his conviction for first-degree murder. **See** Raszler's Brief at 32-34.

Our standard of review is settled:

[w]e review claims regarding the sufficiency of the evidence by considering whether, viewing all the evidence admitted at trial in the light most favorable to the verdict winner, there is sufficient evidence to enable the fact[]finder to find every element of the crime beyond a reasonable doubt. Further, a conviction may be

---

[7] For general purposes the search terms have been summarized into one conceptual term and do not reflect the multiple specific searches Raszler conducted.

sustained wholly on circumstantial evidence, and the trier of fact—while passing on the credibility of the witnesses and the weight of the evidence—is free to believe all, part, or none of the evidence. In conducting this review, the appellate court may not weigh the evidence and substitute its judgment for the fact[]finder.

*Commonwealth v. Miller*, 172 A.3d 632, 640 (Pa. Super. 2017) (internal citations and quotation marks omitted).

Murder is defined, in relevant part, as follows:

§ 2502. Murder

(a) **Murder of the first degree**.—A criminal homicide constitutes murder of the first degree when it is committed by an intentional killing.

18 Pa.C.S. § 2502(a).

The Pennsylvania Supreme Court has described the elements of first-degree murder as follows:

To convict a defendant of first[-]degree murder, the Commonwealth must prove: [(1)] a human being was unlawfully killed; [(2)] the defendant was responsible for the killing; and [(3)] the defendant acted with malice and a specific intent to kill.

*Commonwealth v. Houser*, 18 A.3d 1128, 1133 (Pa. 2011) (internal citations omitted.)

A killing is intentional if it is done in a "willful, deliberate and premeditated" manner. 18 Pa.C.S.A. § 2502(d). The period of reflection needed to establish deliberation and premeditation may be as brief as a fraction of a second. *See Commonwealth v. Rivera*, 983 A.2d 1211, 1220 (Pa. 2009). Indeed, the deliberation and premeditation needed to establish intent exists whenever the assailant possesses the conscious purpose to bring

about death. *Id*. The Commonwealth may use circumstantial evidence to establish the elements of first-degree murder, including the element of intent. *See Commonwealth v. Schoff*, 911 A.2d 147, 160 (Pa. Super. 2006) (citation omitted).

Regarding the element of intent, our Supreme Court has long explained that "murder may be committed without a motive, either actual or apparent, but an established motive may go to prove the related intent[,] just as an absence of motive may be used to deny the existence of intent." *E.g.*, *Commonwealth v. Jones*, 50 A.2d 317, 321 (Pa. 1947) (citations omitted). Furthermore, our Supreme Court recognizes that "[t]he fabrication of false and contradictory accounts by an accused criminal, for the sake of diverting inquiry or casting off suspicion, is a circumstance always indicatory of guilt." *Commonwealth v. Homeyer*, 94 A.2d 743, 747 (Pa. 1953) (citation omitted) (emphasis omitted).

Raszler maintains the evidence was insufficient to sustain his conviction because it "was built entirely on circumstantial evidence." Raszler's Brief at 33. He asserts the lack of an ear- or eyewitness, fingerprints, DNA evidence, surveillance footage, or a confession renders the evidence insufficient. *See id*. He further notes "the Commonwealth never identified an assembled weapon." *Id*.

The trial court explained:

Here, the Commonwealth's evidence showed [Raszler] had a romantic relationship with [the victim]; despite the relationship

- 22 -

ending, [Raszler] continued to text [the victim] thousands of times until she indicated she was going to call the police; [the victim] was killed with a homemade projectile in her driveway, directly across the street from [Raszler's] residence; [Raszler] had a map indicating the distance between his residence and [the victim's] residence; [Raszler] created a homemade firearm and homemade projectile; the projectile that killed [the victim] matched a projectile found at [Raszler's] cabin; and the two projectiles were discharged from the same weapon. Accepting this evidence as true, as well as all reasonable inferences arising therefrom, it was sufficient in law to sustain a conviction for first-degree murder.

Trial Court Opinion, 1/5/24 at 10.

Instantly, Raszler has failed to develop a legal argument. *See* Raszler's Brief at 32-34. First, Raszler disregards our standard of review, which requires that we view the evidence in a light most favorable to the Commonwealth as verdict winner; rather, he discusses the evidence in the light most favorable to him and ignores the fact that this Court does not re-weigh evidence or engage in credibility determinations. *Id*. We decline Raszler's implicit request to violate our standard of review. *See Commonwealth v. Risoldi*, 238 A.3d 434, 454 (Pa. Super. 2020) (rejecting a defendant's presentation of a sufficiency challenge by presenting the evidence in the light most favorable to himself).

In addition, Raszler failed to identify in his Rule 1925(b) statement which elements of the convictions he is challenging and does not cite pertinent legal authority in his brief, thereby waiving his claim. As we have explained,

The Rules of Appellate Procedure state unequivocally that each question an appellant raises is to be supported by discussion and analysis of pertinent authority. Appellate arguments which fail to adhere to these rules may be considered waived, and arguments

- 23 -

which are not appropriately developed are waived. Arguments not appropriately developed include those where the party has failed to cite any authority in support of a contention. This Court will not act as counsel and will not develop arguments on behalf of an appellant. Moreover, we observe that the Commonwealth Court, our sister appellate court, has aptly noted that [m]ere issue spotting without analysis or legal citation to support an assertion precludes our appellate review of [a] matter.

*Coulter v. Ramsden*, 94 A.3d 1080, 1088-89 (Pa. Super. 2014) (quotations and internal citations omitted). Accordingly, Appellant's sufficiency claim is waived. *See Commonwealth v. Liston*, 941 A.2d 1279, 1285 (Pa. Super. 2008) (*en banc*), *affirmed in part and vacated in part*, 977 A.2d 1089 (Pa. 2009); Pa.R.A.P. 2101.[8]

In his fourth and final issue, Raszler challenges the weight of the evidence. *See* Raszler's Brief at 34-36.

We have stated:

The finder of fact is the exclusive judge of the weight of the evidence as the fact finder is free to believe all, part, or none of the evidence presented and determines the credibility of the witnesses.

As an appellate court, we cannot substitute our judgment for that of the finder of fact. Therefore, we will reverse a jury's verdict and grant a new trial only where the verdict is so contrary to the

---

[8] Even in the absence of waiver, this claim lacks merit. As noted above, circumstantial evidence is sufficient to prove first-degree murder. *See Schoff*, 911 A.2d at 160. Here, the evidence demonstrated Raszler continued to harass the victim after she broke up with him, searched on the internet for information about the victim, and in a thoroughly premeditated fashion, researched, purchased the materials for, and built a weapon which fired the projectile that killed the victim. The record is easily sufficient to sustain Raszler's conviction, and had Raszler not waived this issue, we would find it meritless.

evidence as to shock one's sense of justice. A verdict is said to be contrary to the evidence such that it shocks one's sense of justice when the figure of Justice totters on her pedestal, or when the jury's verdict, at the time of its rendition, causes the trial judge to lose his breath, temporarily, and causes him to almost fall from the bench, then it is truly shocking to the judicial conscience.

Furthermore, where the trial court has ruled on the weight claim below, an appellate court's role is not to consider the underlying question of whether the verdict is against the weight of the evidence. Rather, appellate review is limited to whether the trial court palpably abused its discretion in ruling on the weight claim.

***Commonwealth v. Boyd***, 73 A.3d 1269, 1274-75 (Pa. Super. 2013) (*en banc*) (citation and quotation marks omitted). "Thus, the trial court's denial of a motion for a new trial based on a weight of the evidence claim is the least assailable of its rulings." ***Commonwealth v. Diggs***, 949 A.2d 873, 879-80 (Pa. 2008) (citation omitted).

Raszler's argument on this issue is identical to his argument regarding the sufficiency of the evidence, namely the circumstantial nature of the evidence, lack of some physical evidence, and absence of an ear- or eyewitness. ***See*** Raszler's Brief at 34-36.

The trial court stated:

The verdict in this case certainly does not shock one's sense of justice. The jury is free to believe as much of the testimony as they choose and to determine which witnesses are more credible. The jury evidently believed the evidence presented by the Commonwealth, as summarized above, and in doing so, they rendered a verdict consistent with the weight of the evidence[.]

Trial Court Opinion, 1/5/24, at 10-11.

We discern no abuse of discretion by the trial court in reaching its determination, the verdict did not shock its conscience. The Commonwealth presented strong circumstantial evidence Raszler committed premeditated murder. That the jury, sitting as finder of fact, chose to believe the Commonwealth's evidence was entirely within its province. Raszler essentially requests we re-weigh the evidence and assess the credibility of the witnesses presented at trial. This we cannot do, as it is a task that is beyond our scope of review. The jury, as finder of fact, had the duty to determine the credibility of the witnesses and evidence presented at trial. *See Commonwealth v. Collins*, 70 A.3d 1245, 1251 (Pa. Super. 2013) (stating "[a]n appellate court cannot substitute its judgment for that of the finder of fact" in assessing a weight claim). Accordingly, we decline to disturb the trial court's rejection of Raszler's challenge to the weight of the evidence.

Judgment of sentence affirmed.

Judgment Entered.

Benjamin D. Kohler

Benjamin D. Kohler, Esq.
Prothonotary

Date: 12/2/2025